**PRESCRIPTION HOUSE, Inc., v.
ANDERSON et al.**

Civil Action No. 529.

District Court, S. D. Texas, Houston
Division.

Dec. 11, 1941.

Sears, Blades, Moore & Kennerly, by Fred W. Moore, all of Houston, Tex., for plaintiff.

Canessa, Romberg & Cherry, by J. W. Cherry, all of Houston, Tex., for defendants.

KENNERLY, District Judge.

This is a suit by Plaintiff, a Texas corporation, against James Anderson, an employee of Plaintiff, and nine other of its employees and former employees,[1] for a Declaratory Judgment, Section 400, Title 28, U.S.C.A., fixing and declaring the rights of Plaintiff and Defendants under contracts under which Plaintiff employed Defendants, when considered in the light of, and as affected by, the Fair Labor Standards Act of 1938, Sections 201 to 219, Title 29, U.S.C.A. Defendants' Answer in effect denies the material allegations in Plaintiff's complaint, and shows an actual controversy between the parties within the meaning of the Declaratory Judgment Act.

Defendants have filed a counter-claim or cross-action against Plaintiff, in which they charge Plaintiff with violations of the Fair Labor Standards Act, and seek to recover overtime, etc., under such Act. By agree-

---

[1] Such employees are Ellis Corder, H. O. Fuller, J. B. Light, Herbert Pledger, Howard Pledger, M. O. Schuelke, Thomas I. Smith, John Tennison, and Ralph Waymire.

ment of the parties under Rule 42, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, that Plaintiff's suit for Declaratory Judgment should be first tried, this is a trial of Plaintiff's suit.

The facts are substantially as follows:

(a) Plaintiff is a Texas corporation, and its Charter states the purpose of its incorporation, as follows: "The purpose for which this corporation is formed is to carry on a mercantile business dealing in exclusive prescriptions and sick room supplies, physicians' supplies and all such supplies as pertain to a retail drug business."

(b) Under such Charter, Plaintiff has been in business in the City of Houston, Texas, in this Division and District, since about 1924 or 1925, first under the name of The Prescription House of Houston, Texas, and later by Charter Amendment under the name of The Prescription House, Inc.

(c) During certain periods of such time and since the effective date of the Fair Labor Standards Act of 1938, Plaintiff had in its employ all of the Defendants mentioned in Plaintiff's original complaint, but it has dismissed from this case all of them except those hereinbefore mentioned.

(d) During such time, Plaintiff's main and principal business has been and still is the filling of physicians' prescriptions for the general public and the retail sale to the general public of articles used in the sick room. The major portion of such prescriptions and such sales have been and are to persons residing in, and in the vicinity of, the City of Houston, Texas, but occasionally there was a prescription filled for or a sale made to persons outside of Houston and vicinity, but within Texas. On a very few and rare occasions, the person for whom a prescription was filled would temporarily or permanently leave Texas and have Plaintiff to refill a prescription and send same to him at some point outside of Texas.

During such time, Plaintiff has had a place of business or store in the downtown business district of Houston, in which were and are shelves, showcases, counters, etc., for the display and sale of its drugs and merchandise used in filling prescriptions or sold for use in the sick room. It purchased such drugs and merchandise both within and without the State of Texas, and when same was received, it came to rest and was unpacked, placed on display, or used or held in the store, awaiting its turn to be displayed or used. Neither of the Defendants had anything to do with such drugs and merchandise until placed in Plaintiff's store. Small quantities of such drugs and merchandise which had become stale or unused were, from time to time, shipped back by Plaintiff to the persons from whom purchased, but neither of the Defendants had anything to do with such shipments.

The general public came to Plaintiff's store and purchased Plaintiff's drugs and merchandise directly or through the medium of prescriptions filled from such drugs and merchandise by Plaintiff. The general public also ordered Plaintiff's drugs and merchandise by phone and otherwise, and same was delivered to them by Plaintiff's employees. Since commencing business, Plaintiff has filled more than 385,000 prescriptions, and filled more than 40,000 prescriptions during the year 1940.

(e) During such time, Plaintiff's sales of articles used in the sick room, other than prescriptions, were made to several different classes of persons, i. e.:

To the public generally such as they purchased over the counter in Plaintiff's store or ordered over the telephone or otherwise, and Plaintiff delivered to them in Houston and vicinity.

To a number of physicians in Houston and vicinity. The success of one engaged in the filling of physicians' prescriptions depends to some extent upon the good will and patronage of the physicians. Accordingly, Plaintiff agreed to sell, and has been selling, at a price less than the usual retail price, and slightly above wholesale price, articles other than prescriptions to physicians, not for resale but for use in their offices, in the treatment of their patients. Plaintiff made and makes very little profit on these sales. Similar sales have been made and are being made to several hospitals.

Plaintiff made and is making similar sales to other drug stores, but these are largely made after the wholesale drug houses have closed for the day. These sales to other drug stores are reciprocal in their nature, in that they are largely made in an exchange of courtesies between drug stores.

Similar sales have been made and are being made to the Humble Oil & Refining Company in Houston (from whom Plaintiff purchases certain supplies hereinafter men-

tioned), not for resale to the public, but for use in its dispensary, and finally by its employees.

(f) Plaintiff's gross income from the filling of prescriptions and the sale of articles used in the sick room was approximately $92,000 in 1939, $91,000 in 1940, and is running substantially the same in 1941. Of this gross income, approximately 65% or more is derived from the filling of prescriptions and the sale of articles used in the sick room to the general public, the other 35% or less being derived from sales of such articles to physicians, hospitals, other drug stores, and the Humble Oil & Refining Company.

(g) Plaintiff has been not only engaged in the business of filling prescriptions and selling articles used in the sick room, but also in a small manufacturing business. Plaintiff had, during part of such time, a prescription or formula of its own which it filled, compounded and manufactured, and sold at both wholesale and retail, principally in Houston and vicinity, but sometimes outside of Houston and vicinity, and sometimes outside of Texas. It was compounded and manufactured in Plaintiff's store. It was a laxative or remedy for constipation and known as "Cremagol". The major portion of its composition is mineral oil and water, but it contains minor medicinal ingredients.

Prior to the filing of this suit, Plaintiff compounded, manufactured, bottled, and sold Cremagol to the public, physicians, hospitals, other drug stores, and the Humble Oil & Refining Company in Houston and vicinity such as it sold articles other than prescriptions used in the sick room as above described, and sold same to drug stores and others outside of Houston and outside of Texas. Since about the time of filing of this suit, Cremagol has been manufactured and sold by another corporation and not by Plaintiff.

Plaintiff's gross income from the sale of Cremagol during 1939 was approximately $12,000, in 1940 approximately $9,700, and during the portion of 1941 during which Plaintiff carried on that business was approximately the same as 1940. During 1939, approximately 13% of Plaintiff's gross income from all sources was from the compounding and sale of Cremagol, during 1940 10%, and so far in 1941 something more than 9%. Of the sales of Cremagol, approximately 85% to 95% have been made in Texas, and 5% to 15% outside of Texas.

(h) The Defendants Ellis Corder, H. O. Fuller, J. B. Light, Herbert Pledger, Howard Pledger, M. O. Schuelke, John Tennison and Ralph Waymire were employed by Plaintiff as delivery men, their duties being to deliver in Houston, and vicinity, prescriptions compounded by Plaintiff, articles used in the sick room, and Cremagol to the public generally, to physicians, other drug stores, hospitals, and the Humble Oil & Refining Company. Approximately 60% of their time was taken up with actual deliveries. During the balance of the time, they played chess or checkers, slept, lounged around the store, helped as and when called upon around the store, and from time to time aided in a small way in the compounding or manufacturing, bottling, etc., of Cremagol. The Defendants James Anderson and Thomas I. Smith were porters who performed the usual work of porters in and around the place of business of Plaintiff and delivered prescriptions compounded by Plaintiff and articles used in the sick room sold by Plaintiff, including Cremagol, in the downtown area of Houston. These deliveries were usually to physicians' offices. Their spare time was disposed of as was the spare time of the delivery men, such porters working at times in the compounding, manufacturing, bottling, etc. of Cremagol. There is no evidence in the record on which a finding can be made as to the amount of time actually spent by the delivery men and porters in aiding in the compounding, manufacturing, bottling, etc., of Cremagol, and there is no evidence which will enable a finding to be made as to whether they actually worked on any Cremagol which was sold outside of Texas, or if so, how much time they spent thereon.

■ (i) There is a controversy here sufficient to support a suit by Plaintiff for a declaratory judgment, in that Defendants and each of them have claims against Plaintiff under the Fair Labor Standards Act of 1938. All of the Defendants worked for Plaintiff more than 44 hours per week during the first year the Fair Labor Standards Act was in effect and more than 42 hours per week during the second year. They have not been paid for their overtime and have claims against Plaintiff therefor. Some of the Defendants were paid less than the minimum wages prescribed by such Act, which is the basis of claims by such Defendants against Plaintiff.

1. The first question is whether Plaintiff and Defendants under their contracts and in their activities come within the scope of the Act and particularly Sections 6 and 7 thereof, Sections 206 and 207, Title 29 U.S.C.A.

While it appears that Plaintiff purchased part of its stock of drugs and merchandise used in its intrastate business of filling prescriptions and selling articles used in the sick room, from persons outside of Texas, and that same were shipped and transported to Plaintiff in interstate commerce, these transactions were merely incidental to Plaintiff's intrastate business of filling prescriptions and selling articles used in the sick room (Klotz v. Ippolito, D.C., 40 F.Supp. 422), and there is no evidence that Defendants had any connection with such transactions until after such drugs and merchandise were delivered to Plaintiff and came to rest in the store or place of business of Plaintiff. Defendants took and had no part in this trading and transportation in interstate commerce.

While it also appears that Plaintiff, from time to time, shipped back in interstate commerce to persons from whom it made purchases, small quantities of drugs and merchandise that had become stale or were unused, same was also incidental to Plaintiff's intrastate business, and there is no dependable nor convincing evidence that either of the Defendants had a part in or anything to do with such shipments.

It also appears that in rare and isolated instances, persons for whom Plaintiff filled prescriptions left Texas, and Plaintiff, at their request, refilled their prescriptions, shipping the medicine to them in interstate commerce, but such rare and isolated instances are not sufficient to destroy the intrastate character of Plaintiff's business of filling prescriptions and selling articles used in the sick room. There is no evidence that Defendants had a part in or anything to do with such shipments.

It is clear, therefore, that neither Plaintiff's intrastate business of filling prescriptions and selling articles used in the sick room, nor Defendants' work as delivery men and/or porters in connection with such business, come within the scope of the Act and particularly Sections 6 and 7 thereof.

2. But the Plaintiff was, as stated, engaged in two kinds of business. One was the intrastate business of the filling of prescriptions and the sale of articles used in the sick room, already discussed, and the other was the manufacturing and sale of Cremagol. They were, in the main, separate and distinct businesses, although carried on in Plaintiff's store. The evidence shows that since about the time of the filing of this suit, the business of manufacturing Cremagol has been separated from the other business of Plaintiff. Cremagol was manufactured and sold by Plaintiff both at retail and wholesale. Sales were made both within Texas and without Texas, i. e., both in intrastate and interstate commerce. The sales within Texas predominated and represented about 85% to 95% of the total sales of Cremagol. Without doubt, such interstate business and sales were within the scope of the Act, and persons employed by Plaintiff who worked in the manufacturing, packing, shipping, and sale of Cremagol in interstate commerce came within the Act with respect to maximum hours and minimum wages. United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430. However, it must be shown just what part of the work of an employee is in interstate and what part in intrastate commerce, and the evidence here does not show, and it is believed that it can never be shown, the extent and time that Defendants worked in the manufacture, sales, etc., of Cremagol which Plaintiff sold in interstate commerce. Super-Cold Southwest Co. v. McBride, 5 Cir., 124 F.2d 90, decided December 1, 1941, and cases there cited. It follows that Plaintiff is not liable to Defendants for overtime, etc., under the Act because of its manufacture and sale of Cremagol.

3. Plaintiff also claims that it is exempt from the provisions of the Fair Labor Standards Act and particularly Sections 6 and 7, Sections 206 and 207, Title 29 U.S.C.A., under the following provisions of Section 13 of the Act, Section 213, Title 29 U.S.C.A.: "The provisions of sections 206 and 207 shall not apply with respect to (1) *any employee employed* in a bona fide executive, administrative, professional, *or local retailing capacity,* or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator); or (2) *any employee engaged in any retail* or service *establishment the greater part of whose selling or servicing is in intrastate commerce.*"

Taking up first the question of whether Plaintiff's business is a "retail establish-

ment" within the meaning of the second exception quoted.

Plaintiff was incorporated to do a retail business. It had a place of business or store in the downtown business district of Houston, in which it had shelves, showcases, counters, etc., for the display and sale of its drugs and merchandise used in filling prescriptions and sold for use in the sick room. It purchased such drugs and merchandise both within and without the State of Texas, and when same were received, they came to rest and were unpacked, placed on display, or held in the store, awaiting their turn to be displayed. The general public came to Plaintiff's store and purchased Plaintiff's drugs and merchandise either as displayed by Plaintiff or through the medium of a prescription filled or compounded by Plaintiff from such drugs and merchandise. The general public also ordered Plaintiff's merchandise by phone and otherwise, and same was delivered to them by Plaintiff's employees. We have, therefore, all the earmarks of a "retail establishment", and I think the facts here bring Plaintiff's business and Defendants, its employees, clearly within the second exception quoted.

But Defendants say that because of the sales of merchandise to physicians, hospitals, and others, at prices less than the retail price, and but a little above the wholesale price, Plaintiff's business was not a retail establishment. Not so. The sales to the physicians and hospitals did not greatly differ from the sales to individuals either in kind or quantity, except that the physicians and hospitals used it in the treatment of their patients. The reduced price to them was not a wholesale price, but a cut price, designed to secure their prescription business. The sales to other drug stores were clearly of a reciprocal nature for the convenience of all concerned, as were the sales to the Humble Oil & Refining Company, from which Plaintiff purchased oil used in the compounding of Cremagol. Neither such sales nor the fact that Plaintiff manufactured and sold Cremagol robs Plaintiff's business of its nature, i. e., a "retail establishment". This view is supported by the decided cases and is not out of harmony with the rulings of the Administrator. Super-Cold Southwest Co. v. McBride, supra.

With respect to the first exception quoted, I think it is also clear that, under the evidence and the facts found here, De-

fendants were each and all employed in a "local retailing capacity" within the meaning of the first exception quoted.

Plaintiff may have declaratory judgment in accordance herewith.