**FLEMING, Administrator of Wage and Hour Division of United States Department of Labor, v. SONDOCK et al.**

No. 528.

District Court, S. D. Texas, Houston Division.

Jan. 21, 1942.

Warner W. Gardner, Sol., Gerard D. Reilly, Sol., and Irving J. Levy, Associate Sol., all of Washington, D. C., and Llewellyn B. Duke, Regional Atty., Earl Street, Atty., and Robert W. Richards, Associate Atty., all of Dallas, Tex. (Abner Brodie, of Washington, D. C., of counsel), for plaintiff Wage and Hour Division, U. S. Department of Labor.

Baker, Botts, Andrews & Wharton, of Houston, Tex. (James A. Baker, Jr., and Dillon Anderson, both of Houston, Tex.,) for defendants.

KENNERLY, District Judge.

Doing business as the McCane-Sondock Detective Agency, Defendants were long prior to, and at the time, this suit was filed, and have been since, engaged in furnishing for pay, a detective and night-watch service to many and various clients in Houston, Texas, and immediate vicinity, and nearby points, but all within the State of Texas. This is a suit under the Fair Labor Standards Act of 1938, Sections 201 to 219, Title 29 U.S.C.A., by the Administrator under such Act (Section 4), claiming that Defendants and their business and certain of their employees come within the scope of such Act, and particularly Sections 6 and 7 thereof, and seeking to enjoin Defendants (Section 17) from violating such Act with respect to the minimum wages paid such employees and the maximum hours which such employees are required to work. Defendants answer, denying that such Act, particularly Sections 6 and 7 thereof, is applicable to either their business or their employees, and claiming exemption under Section 13(a) (2) of the Act.

The facts are substantially as follows:

(a) At the trial, Plaintiff offered in evidence a Stipulation of the parties, which I quote in part:

"The defendants, J. S. Sondock and M. C. Sondock are residents of the City of Houston, Harris County, Texas. They own and operate as partners the McCane-Sondock Detective Agency, which is the trade name they have assumed in their

business. This business is the successor to the McCane Detective Agency, organized and begun in the year 1893 by James McCane. It has operated continuously in Houston since that time. J. S. Sondock became identified with said business in 1912, and became a part owner of said business in 1926, and in December of 1937 he became the sole owner of said business, and continued as such until August 26, 1940, when M. C. Sondock acquired an interest therein.

The defendants are engaged in furnishing a detective and night watch service to various clients in Houston and environs, but all within the State of Texas, and all except occasional special employments within the City of Houston, Harris County, Texas. About ninety per cent (90%) of the business of the defendants, and approximately that percentage of their income, is derived from furnishing regular night watch service to various business establishments and residences located in and around the City of Houston, Harris County, Texas, and about ten per cent (10%) of the volume of business and income therefrom is derived from furnishing various kinds of detective services and special watch services under special contracts of employment for the furnishing thereof. The defendants employ thirty-six (36) regular employees and others from time to time to do special work as they are needed. Two of their employees and the defendants themselves perform private detective services under special contracts of employment such as assisting police officers in locating persons to be served with process, and other similar services ordinarily within the class of work done by a private detective agency. Defendants themselves handle their own clerical, stenographic, and other work incident to the maintenance of their office in Houston. The defendants now have in their employ 34 full time night watchmen who perform regular right watching services for various establishments—clients of defendants more particularly described hereinafter. In all cases the defendants contract with their clients to furnish detective or watch service for an agreed fee, and they select their own employees who perform the services contracted to be furnished. These employees are responsible solely to the defendants for the performance of the duties assigned to them. These employees are employed and paid by the defendants, and the manner in which they do their work is directed entirely by the defendants. The defendants pay all employers' social security taxes on the amounts paid to these said employees. The defendants maintain a downtown office in the City of Houston, and the watchmen hereinabove referred to do no work in and around this office, but report there from time to time for instructions, reports, and for the purpose of receiving their pay checks."

(b) There is then set forth in the Stipulation a tabulation showing the name of each of the thirty four (34) men now employed by Defendants, how and where employed, the number of hours per week he works, and the wages paid him. This tabulation and the evidence offered in addition thereto show:

That in most instances, Defendants' employees worked more than the maximum hours and/or were paid less than the minimum wages prescribed by the Act.

That Defendants serve approximately 294 clients, of whom approximately 59 are industrial concerns hereinafter referred to, and of whom the balance or approximately 235 are owners of private residences or of purely local or intrastate concerns, and about whom there appears to be no dispute that they have no transactions whatever in Interstate Commerce.

That approximately 13 of Defendants' 34 employees work for Defendants as watchmen for such industrial concerns, 10 as watchmen for residences and other local concerns, 6 as watchmen for both residences, etc. and industrial concerns, 1 in Defendants' offices to answer emergency calls from clients and from the regular watchmen, 1 is a relief watchman, taking the place of men who are off duty on account of sickness and other causes, and 3 are assigned by Defendants to guard a shipyard at Orange, Texas.

(c) In addition to Defendants' 34 regular employees, Defendants employ special men from time to time, and the Stipulation with respect thereto is as follows:

"In addition to these employees, the defendants employ from time to time on a part-time, or as-needed, basis, as many as twenty-five more men who act as watchmen for special tasks, or special occasions, of an unusual nature, where the defendants are employed to furnish watch service and watchmen, as, for example, during Halloween, when some twenty-five extra men were employed to watch residences and retail stores in Houston.

These employees are not on a regular monthly or full time basis. The work that these part-time men do is partly watching residences, retail stores, and small service establishments, and partly concerns or plants which engage either in commerce or in the production of goods for commerce. But for the time that they work they are paid either $2.25 per day for twelve hours work, or in some instances thirty cents per hour or $3.60 per day for twelve hours work, and in a few instances forty cents per hour, or $4.80 for twelve hours work. Some of these employees are pensioners from concerns with which they have worked, and work only during week ends or on special occasions."

(d) Defendants, as stated, serve approximately 59 industrial concerns. With respect to all industrial concerns, the Stipulation shows the following:

"It is agreed that as to all the industrial concerns watched by the defendant except those listed below, the night watchmen make their calls and do their watching at night when the plants are closed for the night and not in operation.

"However, as to the following concerns, only, when the defendant's watchmen call the plants are frequently in operation:

"(1) Lloyd Metal Company.

"(2) Horton & Horton.

"(3) Hirsch Cooperage Corporation."

(e) The name of each watchman and the manner of serving each client are set forth in the Stipulation.[1] There seems to be no good reason to quote the entire Stipulation, but I quote therefrom as to *two watchmen, which seems to be typical of the others:*

"H. C. Holman

"This employee is a watchman on what is known as the defendants' 'Beat No. 27', on which there are 22 places or points watched. The type and kind of establishments so watched are more particularly shown in Exhibit 'D' attached hereto and made a part hereof. His working hours are from 8 p.m. to 5:30 a.m., seven nights per week, with the exception of two nights off during each month. He is paid by the defendants $100 per month for his services, which amount includes expenses for the upkeep and operation of his own automobile, which he uses in connection with his work."

Exhibit "D" is as follows:

"Federal Transportation Company

"2101 Nance Street

"Houston, Texas.

"This concern is a Texas corporation and is engaged in the business of hauling for hire of heavy rigging, stacks and towers, distillation units, graders, and ditching machines, drag lines, and all forms of heavy hauling from Texas points to Texas points. It makes no hauls outside the State of Texas. Some of this equipment so hauled is manufactured in Texas and some in other states. Some of this equipment so hauled is used in the manufacture or processing of oil and oil products, some of which ultimately move in interstate commerce.

"Texas Peanut Products Company

"2300 Rothwell

"Houston, Texas.

"This concern is a Texas corporation and is engaged in the business of manufacturing, handling and selling peanut butter. Approximately ten or twenty per cent of the products manufactured at its plant located at the above address are sold and shipped to points outside the State of Texas. A substantial amount of its products are sold to various agencies of the Federal Government. The remainder of its sales are to wholesale concerns located within the State of Texas.

"Wilson Supply Company

"1412 Maury Street

"Houston, Texas.

"This concern is a Texas corporation engaged in the handling and selling as distributors of all kinds of oil well supplies, pumps, pipes, machinery, etc. Substantially all of the goods purchased by this concern are purchased from other states and shipped to its place of business at the above location. Approximately twenty-five per cent of the concern's total income is derived from the sale and shipment of

---

[1] Over the objections of Defendants, Plaintiff offered a number of witnesses as to transactions between Defendants and the Texas Creosoting Company, Clarke & Courts, Inc., Bethlehem Supply Company, and the Kuhn Paint & Varnish Company. But as there were, at the time of the trial, no contracts in existence between Defendants and such persons, and Defendants were not then furnishing service to such persons, such evidence is regarded as of little, if any, probative force on the issues here, if admissible at all.

goods from its place of business in Houston, Texas, to points outside the State of Texas.

"James & Harwell Brokerage Company
"1513 Chapman Street
"Houston, Texas.

"This concern is a partnership composed of F. K. James and G. L. Harwell, who use the trade name as above stated. They are engaged in the brokerage business, handling staple food products, canned fruits, vegetables, etc. At least seventy five per cent of the goods handled by the concern is purchased from other states and shipped into the State of Texas. Approximately one or two per cent of the total volume of business of the concern is derived from the sale of goods shipped from within the State of Texas to points without the State of Texas, the remaining 98 or 99 per cent of its income being derived from sales to wholesale dealers within the State of Texas.

"Goodyear Tire & Rubber Company
"New Orleans and North Main St.,
"Houston, Texas.

"This concern is a Delaware corporation and the establishment here involved is a distributing house for Goodyear tires, tubes, batteries, etc., the territory which this establishment serves being a part of Texas and a part of Louisiana. All goods handled at this establishment are manufactured in other states and shipped to it at the above address and from there distributed to stores belonging to the concern and to dealers handling its products. Approximately forty to fifty per cent of the total income of this particular establishment is derived from the sale and distribution of goods from Houston, Texas, to points outside the State of Texas.

"Lloyd Metal Company
"1320 Carr
"Houston, Texas.

"This concern is owned by Mrs. Lillian Lloyd, who uses the trade name as above stated. The concern manufactures drainage castings, manhole covers, and many other varieties of metal castings. None of its products are sold or shipped by it to points outside the State of Texas. Approximately ten per cent of these products is sold to dealers. Approximately one and one-half per cent of such products so sold to dealers is transported into other states by such dealers.

"A. Frank Machine Shop
"2520 Leona
"Houston, Texas.

"This establishment is owned by one A. Frank, who uses the trade name as above stated. He is engaged in the business of electric and acetylene welding of all kinds in Houston, Harris County, Texas. His work is done on industrial machinery and the component parts thereof.

"Goodyear Retread Plant
"1513 Chestnut
"Houston, Texas.

"This establishment belongs to the Goodyear Tire & Rubber Company, a Delaware corporation, who uses the trade name as above stated at this particular establishment. This establishment is engaged in the business of retreading used automobile tires which it sells at wholesale only. About one per cent of the total income of this establishment is derived from the sale of tires which it retreads and sells and ships to points outside the State of Texas. The remaining 99 per cent of its sales are to wholesalers for distribution within the State of Texas.

"Horton & Horton
"1230 Bakery Street
"Houston, Texas.

"This concern is a Texas corporation and is a dealer in sand, gravel, cement, shell and ready mixed concrete. It dredges its own shell from the bays along the Texas coast and procures its own gravel from pits within the State of Texas. It sells principally to contractors engaged in constructing and repairing roads, highways, bridges, and buildings. Approximately one per cent of its income is derived from the sale and shipment of goods from its plant located as above shown to points outside the State of Texas. The remaining 99 per cent is derived from sales made in Texas. Approximately five per cent of its products is sold to Gulf Portland Cement Company and becomes an ingredient of its products. Approximately one per cent of Gulf Portland Cement Company's products is shipped into other states.

"Peaslee Gaulbert Corporation
"1110 Shea
"Houston, Texas.

"This concern is a corporation and is a wholesaler and jobber for some 850 varieties of merchandise including radios,

washing machines, floor coverings, chemicals, etc. At least forty or fifty per cent of the goods which it handles are shipped to its place of business in Houston from points in other states. Approximately four or five per cent of the total income of this establishment is derived from the sale and shipment of goods from its place of business in Houston, Texas, to points outside the State of Texas. The remaining 95 or 96 per cent of its sales are to retail dealers within the State of Texas.

"Hirsch Cooperage & Steel Package Company
"3600 Clinton
"Houston, Texas.

"This concern is a Texas corporation engaged in the manufacturing and selling of wood and steel barrels; approximately 99 per cent of its sales are to oil refineries. This concern has one regular customer located outside the State of Texas to which it makes regular sales and shipments of Texas products. Approximately one per cent of its income is derived from this source.

"Approximately thirty eight per cent of the 99 per cent of the containers so sold to refineries are used by them as containers for petroleum products shipped out of the State.

"Burkhead Manufacturing Company
"1920 Herrington
"Houston, Texas.

"This concern is a Texas corporation engaged in the manufacture of metal tubs, pails, cans and other sheet metal products. It makes regular shipments of its products by its own trucks to points outside the State of Texas. Approximately one third of its total income is derived from the sale of its products manufactured at the above location and sold and shipped to points outside the State of Texas.

"F. W. Heitmann Company
"418 North Main
"Houston, Texas.

"This concern is a Texas corporation and is a wholesale dealer in heavy hardware. Approximately 95 per cent of the goods purchased by it are purchased and shipped from points in other states to the place of business of this concern at the address shown above. Approximately two or three per cent of its total income is derived from the sale and shipment of goods from its place of business to points outside the State of Texas. The remaining 97 or 98 per cent of its sales are to various retail dealers situated within the State of Texas.

"Bering-Cortes Hardware Company
"Under Main Street Viaduct
"Houston, Texas.

"This concern is a Texas corporation and buys, handles and sells hardware. Approximately eighty per cent of its business is wholesale and twenty per cent retail. Substantially all of its purchases are obtained from other states and the goods shipped from the place of purchase to this concern's place of business at the above address. It makes no sales or shipments to points outside the State of Texas. It sells at wholesale to retail dealers in the City of Houston, Texas, and adjacent territory.

"Frederick Produce Company
"209 Second
"Houston, Texas.

"This concern is a wholesale dealer in poultry and eggs. All of its purchases are made within the State of Texas, and it makes no sales or shipments to points outside the State of Texas. Its sales are to retail stores.

"H. A. Payne Company
"Houston, Texas — Vacant warehouse.

"Ralston Drug Company
"3318 Lyons Avenue
"Houston Texas — Retail drug store.

"All Right Garage
"3004 Lyons Ave.
"Houston, Texas — Retail and service establishment.

"Weinberg Market & Grocery
"2318 Lyons Ave.
"Houston, Texas. — Retail store.

"Oil Field Service Station
"1901 Brooks
"Houston, Texas — Retail and Service establishment.

"Dorman Lumber Company
"2019 Lee
"Houston, Texas — Retail lumber establishment.

"Holy Name Church
"1920 Marion
"Houston, Texas." — Church house.

"F. R. Burke.

"This employee was employed by the defendants beginning about August 13, 1941, and has worked regularly for defendants since that time. During his employ-

ment he has worked exclusively at the City Junk and Supply Company located at 2305 Lyons Avenue, Houston, Texas. He works from 5:30 P.M. to 6:30 A.M. each night, that is, 13 hours per day. He works seven. nights per week, except that he is allowed two nights off during each month. He makes his rounds on the premises of said City Junk and Supply Company every thirty minutes each night. During his period of employment as above stated he was paid $60 each month by the defendants until October 1, 1941, and since that date he has been paid $65 per month. This amount is paid in two bi-monthly payments.

"The City Junk and Supply Company is a trade name used by Ben Proler. The establishment is located at 2305 Lyons Avenue, Houston, Texas. This concern buys and sells all kinds of scrap iron and scrap metal. It deals with what is known in the trade as 'specialities', that is, it cuts the scrap iron and scrap metal into special sizes and shapes to meet the requirements of customers. Of the total volume of scrap iron and scrap metals handled by this concern, approximately 70 per cent thereof is sold and shipped to purchasers at points outside the State of Texas. Of the remaining thirty per cent a substantial part thereof is sold to purchasers within the State of Texas.

"For a period of slightly more than one year prior to August 13, 1941 the night watch services at said City Junk and Supply Company was performed by R. E. Meloy, 208 Hagerman Street, Houston, Texas. The said R. E. Meloy was employed by the defendants and performed the same services in the same manner as are now performed by F. R. Burke above mentioned, and the said R. E. Meloy was paid by the defendant $60 per month for his services, his hours of work being the same as are now worked by the said F. R. Burke."

(f) All these watchmen, without exception, are employed, discharged, directed, and paid by Defendants. They are directed by Defendants from a central office kept and maintained day and night by Defendants, which office they visit as and when necessary, and with which they can and do communicate by telephone or by a clock and buzzer system owned and maintained by Defendants. In some instances where a watchman watches exclusively at the place of business of one client, it is not necessary for him to, and he does not, visit or communicate with Defendants' central office frequently, but he does so when necessary.

(g) As in the case of R. E. Meloy mentioned above, some of Defendants' watchmen were in the employ of some of Defendants' clients before being employed by Defendants. In some instances, Defendants consult the pleasure of their clients with respect to the employment of watchmen, and in one instance has done so with respect to wages paid a watchman. There is no evidence here, and apparently no claim, that Defendants' contract with any of their clients was made to avoid the effect of the Act.

1. Section 6(a) of the Act, which fixes minimum wages, provides: "Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates—" etc.

Similar language is used in Section 7, fixing maximum hours of employment.

There can be no doubt that Defendants are not themselves engaged in commerce nor in the production of goods for commerce. There can be no doubt that the great majority of Defendants' clients are not themselves engaged in commerce nor in the production of goods for commerce, but some are. Citing Lefevers v. General Export Iron & Metal Company, D.C.S.D. Tex., 36 F.Supp. 838, 839, and other similar cases. Plaintiff insists that the watchmen of Defendants were watchmen within the scope of that case. But the facts here are radically different from those in the Lefevers case.[2] Standing upon a line of cases of which the most recent are Warren-Bradshaw Drilling Co. v. Hall, 5 Cir., 124 F.2d 42, decided December 9, 1941; and Fleming v. Arsenal Building Co., 2 Cir., 125 F.2d 278, decided December 30, 1941, Plaintiff claims that although it may be true that Defendants are not themselves engaged in commerce nor in the production of goods for commerce, within the meaning of the Act, the watchmen who are Defendants' employees are so engaged. Defendants reply that the cases cited are not in point, and point to the language of the opinion in the Bradshaw Drilling Company case, and say that to

---

2 See Brown v. Carter Drilling Company, D.C.S.D.Tex., 38 F.Supp. 489, 491.

hold as Plaintiff contends would produce a reductio ad absurdum.

Defendants cite Farr v. Smith Detective Agency & Night Watch Service, D.C.N.D. Tex., 38 F.Supp. 105; Schrieber v. Kane Service, D.C.S.D.Ill.,[1] and other supporting cases. Because of the view I take of Defendants' claim of exemption under Section 13(a) (2) of the Act, I do not find it necessary to decide the point.

2. Section 13(a) (2) is as follows:

"The provisions of sections 6 [206] and 7 [207] shall not apply with respect to * * *

"(2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce."

The evidence clearly shows that Defendants are engaged solely in furnishing to the public, for a consideration, detectives and watchmen. They furnish watchmen to approximately 294 clients, all of whom reside and do business in the State of Texas, and all except one in Houston and immediate vicinity. Approximately 235 of these clients are not in any manner engaged in Intrastate Commerce, the places of such clients served by Defendants being private residences, dance halls, vacant houses, construction jobs, etc. Approximately 59 of these clients are industrial concerns, most of whom are engaged in part in Interstate but mainly in Intrastate Commerce. Defendants themselves have nothing whatever to do with the business of their clients, except to furnish them watchmen, which watchmen are hired, discharged, directed, and paid by Defendants and not by such clients. Such watchmen in the main work by beats, that is, the places of clients are grouped as to location, and the watchmen visit them periodically during the night, though there are some clients who have a watchman assigned exclusively to watch their places. The visits of all the watchmen are made at night, when the business visited is not open for business nor in operation, except that at three places, the businesses are in operation. While the watchmen do their work in and around the places of business of the clients, and on the streets, they visit or communicate with Defendants' office, either day or night, as and when necessary. They render the client no service other than a watch service. I entertain no doubt that Defendants are a service establishment, and Defendants' employees or watchmen are engaged in a service establishment, within the meaning of the Act.

If the character of Defendants' business alone is to be looked to, then all of Defendants' servicing is in intrastate commerce. If the work or servicing of Defendants' watchmen is to be looked to, then the greater part of their servicing is in intrastate commerce. If the character of Defendants' clients' business is to be looked to, then the greater part of the servicing is in intrastate commerce.

I think the Congress in enacting Section 13(a) (2) meant to include the kind of business in which Defendants are engaged. White Motor Company v. Littleton, 5 Cir., 124 F.2d 92, decided December 12, 1941; Jax Beer Company v. Redfern, 5 Cir., 124 F.2d 172, decided December 10, 1941; Swift & Company v. Wilkerson, 5 Cir., 124 F.2d 176, decided December 10, 1941; Prescription House, Inc., v. Anderson, D.C.S.D.Tex. 42 F.Supp. 874, decided December 11, 1941; Duncan v. Montgomery Ward & Company, D.C.S.D.Tex. 42 F.Supp. 879, decided December 16, 1941.

Judgment for Defendants.

---

[1] No opinion for publication.