BARTHOLOME et al. v. BALTIMORE FIRE PATROL & DESPATCH CO. OF BALTIMORE CITY.

Civ. No. 1657.

District Court, D. Maryland.

Dec. 16, 1942.

Eugene Frederick and S. Raymond Dunn, both of Baltimore, Md., for plaintiffs.

Wendell D. Allen, of Baltimore, Md., for defendant.

CHESNUT, District Judge.

This is another nonjury civil suit under the Fair Labor Standards Act, 29 U.S.C.A. §§ 201–219. The plaintiffs were employes of the defendant which is a Maryland corporation engaged in furnishing special patrolman service for its customers who are owners, lessees or sublessees of buildings in Baltimore City in the State of Maryland. The wages and hours provision of the Act applies only to employes who are (a) engaged in (interstate) commerce or (b) in the production of goods for (interstate) commerce. Plaintiffs do not contend that they were engaged in interstate commerce but do contend that they were engaged in the production of goods for commerce within the meaning of the Act. The defendant denies this contention.

The case has been submitted to the court, after argument by counsel, on a stipulation of facts. The facts so stipulated appear in paragraphs 2 to 8, both inclusive, of a bill of particulars filed by the plaintiffs November 12, 1942, and in a separate stipulation filed by counsel for one intervenor and counsel for the defendant. Somewhat condensed, the facts so appearing are as follows:

1. The defendant is a Maryland corporation engaged in the business of furnishing special patrolman service to its particular contract customers in Baltimore City. It makes written contracts with these subscribers in which it agrees to furnish a man to patrol the district in

which the premises of the subscriber are situated between the hours of 7 p.m., and 6 a.m. daily, who will use all reasonable diligence to discover any trouble that may occur on said premises, such as fire, thieves, open doors and windows, for a stipulated sum to be paid by the customer for a definite period, the company not to be liable for any loss from failure to perform such patrolman services in an amount exceeding $25. If the patrolman discovered any trouble at the building, he was expected to telephone a message to the official police department or otherwise as directed by the subscriber.

2. In the performance of its service to customers the defendant has divided the territory in Baltimore City in which their properties are located, into 13 districts or posts and has assigned to each post one or more employes. Some of defendant's customers are the owners of the buildings in which they are engaged in business, while others are lessees or sublessees of the premises occupied by them. Some of the subscribers are engaged in interstate commerce *in whole or in part*, while other subscribers are engaged in local intrastate commerce only. During the period of time involved in this suit the defendant had 820 subscribers doing business in 820 different buildings located in Baltimore City. 306 of such subscribers were engaged either in whole or in part in interstate commerce; 514 of such subscribers were engaged in local or intrastate commerce only. 37% of the customers were thus engaged in interstate commerce in whole or in part and 63% in only local or intrastate commerce.

3. The number of separate buildings for which patrolman service was furnished by the defendant on each of the 13 separate posts varied from 28 to 92 in number. The percentage of interstate commerce subscribers in each of the posts varied. The minimum percentage on any one post was 6%, and the maximum was 82%. On 9 of the 13 posts the percentage of subscribers engaged in whole or in part in interstate commerce was less than 50%. In addition to the 13 regular posts the defendant occasionally furnished special patrolman services for special buildings at irregular intervals, and some of the plaintiffs were employed for such special services. Approximately 50% of such special buildings housed occupants engaged in whole or in part in interstate commerce. The bill of particulars and separate stipulation contain a statement showing the number of the posts to which each of the 23 plaintiffs were assigned as patrolmen, the number of buildings thereon, and the percentage of subscribers engaged in whole or in part in interstate commerce. The percentage of customers whose premises were given special patrolman service by the several plaintiffs varied from 6% to 82% with respect to customers engaged in whole or in part in interstate commerce. Of the 23 plaintiffs, 11 patrolled a post in which less than 50% of the subscribers were engaged in interstate commerce in whole or in part; 5 patrolled posts in which 50% of the subscribers were engaged in interstate commerce in whole or in part, and the remaining 7 patrolled posts in which the majority of subscribers were engaged in interstate commerce in whole or in part.

4. The service performed by the patrolmen for 12 of the 13 posts was to walk from building to building, and on the remaining post the patrolman drove an automobile from building to building. The purpose of the service was to protect the subscribers, buildings and contents thereof, including chattels, goods in process, raw materials and finished products against the hazards of fire, theft, open doors and windows. Each foot patrolman patrolled each building on his post approximately six times from 7 p.m. to 6 a. m. The patrolman by automobile patrolled each building on an average of four times.

5. Out of 820 buildings for which service was provided, the defendant maintains time clocks in 79 buildings which are punched when the respective patrolmen pass such buildings. They enter 77 buildings for the purpose of turning the electric lights on or off at regular times, such electric lights being maintained on the first floor at or near the front of the building.

6. The amount of additional wages claimed by the respective plaintiffs as itemized in the bill of particulars aggregates about $14,000, which the plaintiffs ask to have doubled in amount as liquidated damages in accordance with 29 U.S.C.A. § 216. The defendant does not dispute the correctness of the plaintiffs' mathematical computation of their respective claims, but denies any legal liability therefor under the Act.

▉ The *conclusion of law* is that none of the plaintiffs were engaged in the production of goods for interstate commerce within the meaning of the Act, and therefore the defendant is entitled to a judgment in its favor with taxable court costs allowed to it.

It is obvious that the defendant in this case is not engaged in interstate commerce, or in the production of goods for interstate commerce, or in intrastate commerce in any way substantially affecting interstate commerce, unless the activities of its employes resulted in such engagement. It is not contended by the plaintiffs that they were personally engaged in interstate commerce, but the contention is made they were engaged in the *production of goods* for interstate commerce within the meaning of the Fair Labor Standards Act (§§ 206, 207). The only question here involved, therefore, is whether the activities of the plaintiffs as employes of the defendant were such that they could properly be said to be engaged in the production of goods for interstate commerce. This particular question, arising on different facts, has been very recently considered by the Supreme Court in the cases of Kirschbaum v. Walling and Arsenal Building Corp. **v.** Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638. In those cases the question was whether certain employes of large loft buildings in Philadelphia and New York respectively were engaged in the production of goods for commerce. The tenants of the buildings were *principally* engaged in the production of goods for interstate commerce. It was held that certain employes of the landlords of the buildings, including engineers, firemen and elevator operators, *watchmen*, porters, and carpenters, were engaged in the production of goods for commerce within the meaning of the Act. Attention was called to section 3(j) of the Act, 29 U.S.C.A. § 203(j), which defined the word "produce" as follows: " 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation *necessary to the production thereof,* in any State". (Italics supplied.) The holding of the court in the cases was that the

work of the described employes was necessary in the production of goods for commerce. In the opinion by Mr. Justice Frankfurter, it was said (page 525 of 316 U.S., page 1121 of 62 S.Ct., 86 L.Ed. 1638): "But the petitioners urge that § 3(j) cannot be construed literally, that Congress surely did not design the Act to apply to every employee who happens to perform services that are essential to the production of goods for commerce. But because some employees may not be within the Act even though their activities are in an ultimate sense 'necessary' to the production of goods for commerce, it does not follow that no employees whose activities are 'necessary' are entitled to the benefits of the Act. Section 3(j) cannot thus be read out of the Act. The lower court in No. 924 met the petitioners' argument by finding the Act applicable to these employees because their work was 'in kind substantially the same as it would be if the manufacturers employed them directly'. In the immediate situation, the answer may be adequate; but as a guiding criterion it may prove too much. 'Necessary' is colored by the context not only of the terms of this legislation but of its implications in the relation between state and national authority. We cannot, in construing the word 'necessary', escape an inquiry into the relationship of the particular employees to the production of goods for commerce. If the work of the employees has only the most tenuous relation to, and is not in any fitting sense 'necessary' to, the production, it is immaterial that their activities would be substantially the same if the employees worked directly for the producers of goods for commerce."

▉ Counsel for the plaintiffs in the case urge that this recent decision of the Supreme Court is here controlling. But I do not think so. The Supreme Court was there dealing with a particular situation arising out of definitely stated facts which importantly included the fact that the tenants of the building were *principally* engaged in the production of goods for commerce. The particular kind of business was the manufacture of clothing. In the instant case we have no such definite fact. Counsel have deliberately agreed to submit this case for final decision on certain stated facts. The facts so stipulated do not affirmatively include the fact that the owners or tenants of the buildings for which the defendant furnished special patrolman

services were engaged *in the production of goods* for interstate commerce. The only statement in this respect is that some of the owners or tenants of the buildings patrolled by the defendant's employes were engaged "in whole or in part" in interstate commerce. What kind of interstate commerce is not stated. Particularly it is not stated that any of the defendant's customers manufactured, mined, handled, or in any other manner worked on goods or raw materials in Baltimore City intended to be shipped in interstate commerce. The burden of proof is on the plaintiffs to show that their activities brought them within the Act, and the meagreness of the facts stipulated in this respect was called to the attention of counsel at the argument. The definition of goods in section 203(i) of the Act is restricted to tangible things.

In the Kirschbaum case it was held that it was not essential that the employe should be physically engaged in the production of goods, by reason of the concluding phrase of section 203(j) reading: "Or in any process or occupation *necessary* to the production thereof". (Italics supplied.) Therefore the exact question that we have in this case is whether the described kind of special patrolman service for buildings occupied by owners or tenants engaged in whole or in part in *some* form of interstate commerce, can be said to be necessary to the production of goods for commerce. Interstate commerce is, of course, much wider than the manufacture or physical production of goods for interstate commerce. Section 203(b) defines commerce to include "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof". For all we know of the nature of the interstate commerce, in whole or in part, of the owners or tenants of the patrolled buildings in this case, they may have been engaged in such commerce only by virtue of correspondence or other communication among the several States, as for instance, in banking. That could hardly be described as "production of goods for commerce", within the definition of 203(j). See Burton v. Zimmerman, 4 Cir., Nov. 9, 1942, 131 F.2d 377; Brandell v. Bank & T. Co., D.C., 43 F.Supp. 781. Then again in the Kirschbaum case the tenants of the buildings were "principally engaged in the production of goods for interstate commerce". Page 519 of 316 U.S., page 1118 of 62 S.Ct., 86 L.Ed. 1638. In the instant case the only fact we know is that some of the tenants were engaged *in part* in interstate commerce, but to what extent some of them were so engaged we are not told.

The stipulated facts with which we must deal in this case are materially different from the set of facts dealt with in the Kirschbaum case. There a watchman for a building whose tenants were principally engaged in the production of goods for commerce, was held himself to be engaged in an occupation necessary to the production of goods because he protected the building from fire and theft. The mere fact that he was employed by the owner of the building and not by the tenants who were themselves engaged in producing the goods, was held not to be a necessarily controlling feature in the particular case; but it clearly appears from the opinion that the court did not lay down any universal formula for all cases. It was said (page 520 of 316 U.S., page 1118 of 62 S.Ct., 86 L. Ed. 1638): "To search for a dependable touchstone by which to determine whether employees are 'engaged in commerce or in the production of goods for commerce' is as rewarding as an attempt to square the circle. The judicial task in marking out the extent to which Congress has exercised its constitutional power over commerce is not that of devising an abstract formula. Perhaps in no domain of public law are general propositions less helpful and indeed more mischievous than where boundaries must be drawn under a federal enactment between what it has taken over for administration by the central Government and what it has left to the States. To a considerable extent the task is one of accommodation as between assertions of new federal authority and historic functions of the individual states. The expansion of our industrial economy has inevitably been reflected in the extension of federal authority over economic enterprise and its absorption of authority previously possessed by the States. Federal legislation of this character cannot therefore be construed without regard to the implications of our dual system of government."

And again (page 526 of 316 U.S., page 1121 of 62 S.Ct., 86 L.Ed. 1638) quoting from Gully v. First National Bank, 299 U. S. 109, 117, 57 S.Ct. 96, 81 L.Ed. 70), it was said: "What is needed is something of that common-sense accommodation of judgment to kaleidoscopic situations which

characterizes the law in its treatment of problems of causation."

Counsel call the plaintiffs in this case "watchmen" and thus by mere name stress the similarity of the plaintiffs' activities to those of the watchmen referred to in the Kirschbaum case. We must be on guard against the implications arising from mere similarity of names. While it is doubtless lexicographically correct to call the plaintiffs in this case "watchmen" in the general sense, it is clear that their duties were quite different from those of the watchman referred to in the Kirschbaum case. Indeed the correct noun to describe the plaintiffs' activities is "patrolman" rather than "watchman". The defendant's contract with its subscribers agrees to furnish "patrol" and not "watchman" service. A true watchman for a building is one whose services are constant watching or patrolling of the particular building or contiguous group of buildings. In this case the activities of the plaintiffs covered a considerable city territory apparently containing many hundreds of separate buildings, only a few of which were given attention, and the attention so given was limited to customarily passing or patrolling the building six times between 7 p.m., and 6 a.m.; and in promptly reporting any trouble observed. For a comparatively few buildings, some of the plaintiffs also entered the first floor of the building to turn electric lights on or off, and also in the case of some buildings, a watch clock was punched. If this service rendered by the plaintiffs is properly to be called watchman service at all, it is apparent that it is greatly lesser in degree than that of such a watchman as was referred to in the Kirschbaum case. A difference in degree may amount to a difference in kind. The services performed by the plaintiffs were substantially only supplemental to the ordinary activities of the public police on night duty. It would seem to be an extreme contention that the ordinary "policeman on the beat" is engaged in the production of goods for interstate commerce.

The ultimate question is whether the described patrolman services performed by the plaintiffs have such close relationship to the production of goods for interstate commerce that it can properly be held the plaintiffs themselves were engaged in the production of goods for commerce. On the facts stipulated in this case I am unable to reach the conclusion that they were so engaged. I do not think it can be fairly said that the plaintiffs' services were "necessary" in the production of goods for commerce, even if we could find that some of the defendant's customers were in fact producing goods for interstate commerce. It is true that the word "necessary" is a term of some flexibility dependent on the context. It may mean "absolutely" necessary or only "reasonably" necessary in different connections. It may also be said that the Act should be liberally construed to accomplish its stated objectives. But, as pointed out in the Kirschbaum case, we are here dealing with the constitutional distribution of powers between the federal and State Governments, and the former has jurisdiction, where the matter involved is intrinsically intrastate, only where the activity "substantially" affects interstate commerce. United States v. Darby, 312 U.S. 100, 119, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; United States v. Wrightwood Dairy Co. 315 U.S. 110, 119, 62 S.Ct. 523, 86 L.Ed. 726. Therefore here the word "necessary" should at least connote "substantially" necessary. The limited nature of the patrolman service given the buildings of the defendant's subscribers cannot fairly be said to be "substantially" necessary to their business. It is common knowledge that thousands, and doubtless the great majority, of such business buildings do not have this special patrolman service, but rely on the ordinary public police protection. And we are not told in this case that any of the subscribers have business of such a particular nature that the ordinary police protection would be substantially inadequate. No doubt the subscribers think the supplemental patrol by the defendant's employes worth what it costs them (we do not know the amount), but the facts stipulated do not affirmatively show the necessity therefor. Nor is it reasonable to infer that the absence of the special patrolman service would substantially interfere with interstate commerce in any way.

Counsel for both parties have cited a number of opinions of the lower federal courts dealing under varying factual situations with the question as to whether a "watchman" is within the Act. It seems unnecessary to review these cases decided before the Kirschbaum case. Only a few deal with the particular situation that we have here, that is where the watchman or patrolman is employed by an independent contractor such as the defendant in this

104

case, and not by an employer himself engaged in the production of goods for commerce. Fleming v. Sondock, D.C., 43 F. Supp. 339 (now said to be pending on appeal in the 5th Circuit) presented a factual situation quite similar to that of the instant case. It was, however, a suit by the administrator for an injunction against the defendant which was a local detective agency furnishing special watchman or patrolman service to numerous clients in Houston, Texas, a minority of whom only were engaged in interstate commerce. In that case it was found unnecessary to determine whether the employes were engaged in the production of goods for commerce or in interstate commerce because it was held that the defendant was exempt from the provisions of the Act by reason of section 213(a) (2) which provides that "The provisions of sections 206 and 207 of this title shall not apply with respect * * * to any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce."

The defendant in this case also relies on this exemption if necessary for the decision. However, in view of the conclusion heretofore reached it is unnecessary to decide this point.

Other cases in which a defendant furnishing patrolman or special watchman service has been held not liable under the Act for various reasons are Farr v. Smith Detective Agency & Night Watch Service, Inc., D.C., 38 F.Supp. 105; and Schrieber v. Kane Service Co., D.C.Ill., 1940, no opinion for publication. See, also, Bowman v. Pace Co., 5 Cir., 119 F.2d 858.

Counsel for the defendant also submits the contention that if the plaintiffs are entitled to the benefit of the Act at all, some part of their respective claims is barred by the Maryland three-year statute of limitations applicable to ordinary suits based on contracts express or implied. (See Md. Code, 1939, Art. 57, § 1); while counsel for the plaintiffs contend that the applicable statute is that in the Maryland Code, Art. 57, § 3, which provides a period of twelve years where the suit is on a "statute merchant, or of the staple or other specialty whatsoever". But it is also unnecessary to rule upon this contention.

For these reasons, I conclude that judgment must be given for the defendant, and the clerk is instructed to enter it accordingly.