**BARBE v. CUMMINS CONST. CO.**
Civil Action No. 906.

District Court, D. Maryland.
March 8, 1943.

Wylie L. Ritchey and George A. Mahone, both of Baltimore, Md., for plaintiff.

Miles & O'Brien and A. Walter Kraus, Jr., both of Baltimore, Md., for defendant.

CHESNUT, District Judge.

This is a suit under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., to recover unpaid compensation for overtime work under section 207. That section provides:

"No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—

"(1) for a workweek longer than forty-four hours during the first year from the effective date of this section [Oct. 24, 1938],

"(2) for a workweek longer than forty-two hours during the second year from such date, or

"(3) for a workweek longer than forty hours after the expiration of the second year from such date,

unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

The facts of the case are contained in a stipulation of facts made by the parties, which is a summarization of certain depositions heretofore taken in the case. This stipulation, supplemented to some extent by the agreement of counsel in open court, may be further summarized and condensed as follows:

The Cummins Construction Company is a Maryland corporation which for many years past has been engaged in a large way as a general contractor for the construction of buildings, largely for industrial purposes, in Baltimore City and the State of Maryland and, to some extent, elsewhere. The plaintiff was employed by it as a "cement finisher" more or less continuously from November 1938 to August 1940. In its labor relations the defendant maintained a closed shop agreement with labor unions and paid the union scale of wages. The plaintiff was a member of such a union and was paid in accordance with the union scale by the defendant during the whole period of his employment. His hourly rate of pay was always more than one dollar per hour for straight time and therefore always more than the minimum rate prescribed by section 206 of the Act.

The controversy in this case as to overtime pay arose from the following situation. It is the contention of the defendant that throughout the time of the plaintiff's employment its union employes were paid at the rate of *double* time for overtime work, that is, for hours of work in excess of eight hours a day or forty hours a week; but about three-fourths of the time-keepers employed by the defendant to record the time of different employes made their daily or weekly reports of overtime, not on the basis of so many hours overtime specifically, but by turning in a report of the number of hours overtime as straight time multiplied by two. That is to say, if on any day an employee, such as Barbe, worked for *nine* hours, the time-keeper would credit him with *ten* hours work as straight time, and therefore the time credited to the respective employes as entered on the general books of the defendant showed not the actual overtime, in most instances, but a really overstated amount of overtime. This was in accordance with current practice generally prevailing and made no difference in the actual compensation paid to the employes according to the union scale of wages; but it was obviously not in strict accordance with the requirements of the Fair Labor Standards Act. It appears that the attention of the defendant was not called to this situation with respect to its records until the plaintiff Barbe made his claim in this case, when promptly under advice of counsel the defendant changed its practice so that the record of the employes' time on its books was made specifically with respect to the exact amount of overtime in each case. The plaintiff's contention with respect to the amount of overtime is based on the defendant's books as the amount of time is recorded thereon without correction for the incorrect practice. The plaintiff contends that he is entitled to extra compensation on the basis of the whole weekly overtime as thus shown on the defendant's books; while the defendant contends that if the books are properly corrected to correspond with the real facts there is no unpaid overtime under the Act now due to the plaintiff. However, for the purpose of this case, it has been stipulated by counsel that this dispute as to the alleged unpaid overtime shall be liquidated at five hundred dollars ($500.), including the additional equal amount as stipulated damages provided for in the Act (section

216(b), in the event that the court is of the opinion under all the facts that the plaintiff is entitled to recover.

With respect to the latter question as to whether the plaintiff is entitled to any extra compensation under section 207, the facts of the case are these. In the course of its building operations the defendant makes a general contract with the property owner for the construction of a particular building. The defendant then in turn frequently makes sub-contracts with sub-contractors for the materials or labor or sometimes both materials and labor for a part of the whole work. The defendant at times also directly orders material for the construction work and also employs directly its own labor for the work to be done thereon at the building site. In some cases, probably the majority, the defendant's order for materials is placed directly with a material man in Baltimore City, but in other cases the order is given directly to a material man or sub-contractor in another State. In some cases the material ordered is produced within the State of Maryland, but in others it is shipped into the State from other States, either on the order of the defendant directly or through a sub-contractor. In all cases the material is delivered on the site of the work or at least in Baltimore City, and in the latter case is transported from the carrier's terminal to the site of the work.

During the period of the plaintiff's employment by the defendant the plaintiff was engaged from time to time as a "cement finisher" in connection with the construction work in Baltimore City of seven separate buildings and in one case, that of the York Safe & Lock Company, the plaintiff was employed by the defendant at York, Pennsylvania, for a very short period of time in November 1938. In all cases the plaintiff's work was limited to the cement and concrete work necessary in connection with the buildings. Apparently the cement was generally obtained by the defendant from local suppliers, or from its own warehoused stock in Baltimore, but in case of one of the eight buildings the cement was ordered by the defendant from the local branch of a foreign corporation, and shipped to Baltimore from another State. For some of the buildings the cement work constituted a large part of the whole construction; in others, it was only used for particular purposes, as in foundations or grouting for structural steel, or as a base for steel vault doors. For all the buildings some of the material was delivered in Baltimore from States other than Maryland, either on orders from the defendant to local branch officers, or directly to the foreign vendors, or on orders of the defendant's sub-contractors.

The plaintiff's work was primarily that merely of a cement "finisher", that is, levelling or pointing up the concrete after the wooden frames were removed therefrom; but in other cases he assisted in pouring the cement into the wooden forms. His work did not involve in any case the handling or transportation of supplies or materials shipped into Maryland from other States. Ordinarily the plaintiff acted simply as an individual workman, but in some cases, where there were several cement finishers at work at one time, he acted as foreman or assistant foreman for that class of work. A case illustrating the kind of work done by Barbe was that of the Coca Cola Building in Baltimore City, constructed by the defendant as the general contractor in the latter part of 1938, and 1939. The structural steel for this particular building was ordered by the defendant directly from the Bethlehem Steel Company at Bethlehem, Pennsylvania; was shipped from Pottstown, Pennsylvania, to the defendant in Baltimore and erected by the defendant. For the same building the defendant placed an order with the Celotex Corporation of Chicago, Ill., for lumber to be used in the cement forms, which was shipped from Laurel, Mississippi, to the defendant at Baltimore. Barbe worked in connection with grouting the structural base plates on which the structural steel rests. He had no connection with installation of the structural steel except in connection with the grouting. He worked in connection with the pouring of concrete around the horizontal and vertical structural steel. This work was done in the usual way with wooden frames and concrete poured into the forms. In the case of the same building wooden frames were used in connection with placing of the cement floors; when the frames were removed the finishing process took place where the ceiling was entirely concrete. Barbe worked in connection with the smoothing or chipping off of the irregular places of concrete and supervised the pouring of the concrete, but Barbe did not either as foreman or otherwise do any work in connection with the installing or actual building of the wooden frames. In the case of

the same building the defendant made a contract with the York Safe & Lock Co., of Pennsylvania through its branch office at Baltimore for vault depositories manufactured at York and shipped to Baltimore. The York Safe & Lock Co., contracted to furnish, deliver and install the equipment. Concrete or cement was used by the defendant in connection with the installation only after the equipment was placed. Probably Barbe assisted in the installation of the concrete walls and floors and ceilings in connection with the vault. And for the same building floors for corridors and hallways had finished linoleum. Barbe probably worked on this "float" surfacing.

The Act (section 207) applies only to employes who are engaged in interstate commerce or in the production of goods for interstate commerce. In this case the plaintiff does not contend that he was engaged in the production of goods for commerce, but does contend that he was engaged in interstate commerce. Section 203 defines "commerce" as follows: "'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof." The plaintiff was not engaged in any way (except possibly in one minor instance) in the transportation or transmission of material ordered by the defendant and transported to it from outside the State; but the contention of the plaintiff is that during the construction of the buildings he worked, in one instance, on cement which had been transported into the State on an order placed by the defendant with a local branch office of the vendor, and that such material was in commerce until it was physically incorporated in the building. And as to the great majority of the plaintiff's work, his contention is that even though the cement on which he worked was procured locally from within the State by the defendant, nevertheless the plaintiff was engaged in commerce by reason of the fact that the cement work going into the building, the materials for which came from without the State, that the plaintiff's work was in commerce. In this connection he refers also to the definition of "goods" in section 203(i) as follows: "'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods

after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."

In my opinion this contention is not sustainable. The interstate movement of the building materials which were obtained by the defendant or through its subcontractors from outside the State had clearly ended when the materials were unconditionally delivered to the defendant at the building site. The plaintiff's work thereon clearly was of an entirely intrastate and local character. The definition of "goods" just above quoted has its more particular application where the employe contends that he was engaged in the production of goods for commerce. No doubt the definition may also in some particular cases have application with respect to what constitutes commerce; but within the definition the defendant as a building contractor is properly to be regarded as the ultimate consumer of the building materials rather than a producer, manufacturer or processor thereof. These latter words are not appropriate to describe a builder engaged in purely local building operations.

The plaintiff's contention does not find support in any prior decision on the Act. On the contrary a precisely opposite view has been announced by the administrative agency created by the Act. In its Interpretative Bulletin No. 5 of October 1940, page 7, paragraph 12, this view is expressed as follows: "The question arises whether the employees of builders and contractors are entitled to the benefit of the Act. The employees of local construction contractors generally are not engaged in interstate commerce and do not produce any goods which are shipped or sold across State lines. Thus, it is our opinion that employees engaged in the original construction of buildings are not generally within the scope of the Act, even if the buildings when completed will be used to produce goods for commerce. There may be particular employees of such construction contractors, however, who are engaged in interstate transportation of materials or other forms of interstate commerce and are for that reason entitled to the benefits of the Act."

Counsel for the defendant has also called attention to an opinion letter from the Wage & Hour Division, dated April 1, 1941 reading: "Employees of concrete mixing concerns who are engaged in mixing the

various raw materials received from without the State, and in transporting such materials to the sites of construction jobs are not covered by the Act where the concrete is prepared solely for construction work within the State in which the concrete is mixed, since the operation performed by the employees, because of their technical character and the chemical composition existing between the raw materials and the finished product, constitute rather a process or production of goods for local use than a mere incident of the interstate distribution of raw materials."

It is unnecessary in this case to review the scope of the Act in general or its particular provisions in detail. The subject matter has been very extensively discussed in numerous recent decisions of the Supreme Court and other federal courts. Recently opinions have been written in several of these cases in this court. Thompson v. Daugherty, D.C., 40 F.Supp. 279; Missel v. Overnight Transportation Co., D.C., 40 F.Supp. 174; Id., 4 Cir., 126 F.2d 98; Overnight Transportation Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682; Schroepfer v. A. S. Abell Co., D.C., 48 F.Supp. 88; Bartholome et al., v. Baltimore Fire Patrol and Despatch Co., D.C., 48 F.Supp. 98.

█ It is now well established that it is the character of the employe's particular activities that determines whether he is within the coverage of the Act. It is not sufficient that the employer is engaged substantially or even generally in interstate commerce, if the work or activities of the employe are not also in the field of interstate commerce. Thus if we assume that the defendant in this case was engaged in interstate commerce to the extent that it ordered and received materials from outside the State (Currin v. Wallace, 306 U.S. 1, 10, 59 S.Ct. 379, 83 L.Ed. 441), it does not follow that the plaintiff in locally working on some of the material in the construction work on the buildings was personally engaged in interstate commerce.

█ I find no support for the plaintiff's contention in the recent Supreme Court cases construing and applying the Act with respect to different classes of employes. Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, dealt with employes who under the particular circumstances were held to be engaged in the production of goods for commerce, and therefore the case is not directly in point here except for the general principles stated in the opinion. Walling v. Jacksonville Paper Co., 63 S.Ct. 332, 87 L.Ed. ——, and Higgins v. Carr Products Co., 63 S.Ct. 337, 87 L.Ed. ——, both decided January 18, 1943, dealt with employes of wholesale merchandising companies. In the Walling case it was held that employes who were engaged in handling interstate shipments in the course of their delivery to the ultimate consumers for whom they were procured were to that extent engaged in interstate commerce; but that merchandise obtained from without the State to be held for general sale and subsequently handled or delivered to customers by employes did not involve the engaging in interstate commerce by such latter employes. In the Higgins case all the employes involved were in the latter category. Overstreet v. North Shore Corp., 63 S.Ct. 494, 87 L.Ed. ——, decided February 1, 1943, deals with maintenance employes of a draw-bridge spanning a navigable stream. The Act was held applicable to them. In the Walling case, as in the prior Kirschbaum case, the distinction was clearly pointed out between the scope of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., which is applicable where the employer is engaged in activities affecting interstate commerce, and the Fair Labor Standards Act which is not applicable unless the employe is engaged in the production of goods for commerce or is himself engaged in interstate commerce. In both the Kirschbaum case and the Walling case it is also pointed out that Congress evidently did not intend to go so far in the latter Act as in the former with respect to the regulation of interstate commerce; and it is particularly in point to note the sentence in the opinion in the Walling case which reminds us that "in this connection we cannot be unmindful that Congress in enacting this statute plainly indicated its purpose to leave local business to the protection of the states". [63 S.Ct. 336, 87 L.Ed. ——.] And, as was said in the Overstreet case—"and in determining what constitutes 'commerce' or 'engaged in commerce' we are guided by practical considerations." [63 S.Ct. 496, 87 L. Ed. ——.] The purely local construction of a building in a particular State is, from a practical point of view, a definitely local matter only.

The nearest analogy that counsel for the plaintiff can refer to in any decided case is Newport News Shipbuilding & Dry Dock Co. v. National Labor Relations Board,

4 Cir., 101 F.2d 841, 843, reversed on another point 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219. In that case it was held that the Labor Board had jurisdiction over the Shipbuilding Company by reason of its activities affecting commerce. That case is, however, clearly distinguishable both on the law and the facts. In the first place it arose under the National Labor Relations Act where jurisdiction is given if the employer is engaged in activities affecting interstate commerce. And on the facts the building operation in which the employer was engaged was the construction of ships both for the United States Government and for private parties. Much of the material for the ships was brought in from other States. There is, of course, an obvious practical difference in the building of ships which are intended to plow the seas as vital instrumentalities of commerce, and the construction of a building in a large city; even though technically in the field of admiralty jurisdiction, the building of a ship, before it is launched and completed, is not considered a maritime contract.

For these reasons my conclusion of law is that the Act is not applicable to the plaintiff; and the clerk is therefore instructed to enter judgment for the defendant, with taxable court costs to be paid by the plaintiff.