CRABB v. WELDEN BROS.

WELDEN BROS. v. DEDRICK.

DEDRICK v. WELDEN BROS.

C. F. LYTLE CO. et al. v. PETERSON.

SAME v. VOLLUM.

Nos. 13435–13439.

Circuit Court of Appeals, Eighth Circuit.

Dec. 1, 1947.

798

Peter W. Janss, of Des Moines, Iowa, and Bert E. Church, of Kansas City, Mo., for Welden Bros., C. F. Lytle Co. and Green Construction Co.

Howard L. Bump, of Des Moines, Iowa, for S. F. Crabb and Frank B. Dedrick.

Mr. Alfred T. Vollum, of Albert Lea, Minn., for Gustaf E. Peterson and Gilbert E. Vollum.

Charles M. Bump, of Des Moines, Iowa, for Frank B. Dedrick.

William S. Tyson, Sol., Morton Liftin, Acting Asst. Sol., and Frederick U. Reel, Atty., U. S. Department of Labor, all of Washington, D. C., and Reid Williams, Regional Atty., U. S. Department of Labor, of Kansas City, Mo., for Administrator of Wage and Hour Division, Amicus Curiae.

Before GARDNER, WOODROUGH and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

These appeals are from judgments entered in four separate actions brought to re-cover alleged unpaid overtime compensation, liquidated damages, attorneys' fees, and costs, under the provisions of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. The employer defendants have appealed in Nos. 13436, 13438 and 13439, while the employee plaintiffs have appealed in Nos. 13435 and 13437. The employer defendants on these appeals contest any right of recovery by any of the plaintiffs. The employee S. F. Crabb has appealed on the ground that he was denied any compensation for overtime, and the employee Frank B. Dedrick has appealed on the ground that while he recovered judgment, his overtime compensation was incorrectly computed. All the actions were consolidated for purposes of trial and although a separate judgment was entered in each case the appeals have been consolidated in this court and are presented on a single record.

During the war with Japan, and as a military measure, the United States, early in 1942, proposed the building of a highway from Dawson Creek, British Columbia, through Fort Nelson, Watson Lake and Whitehorse, Canada, to Fairbanks, Alaska. The United States and the Canadian government entered into an agreement by which the Public Roads Administration of the United States was to build the highway at the expense of the United States, and to maintain the highway through Canada until six months after the termination of the war. Early in May, 1942, the Public Roads Administration employed the C. F. Lytle Company and the Green Construction Company as project managers and ultimately some eighteen other contractors to assist in the construction of the highway. The contracts were cost-plus-a-fixed-fee contracts, by the terms of which all expenses and operating costs were to be paid by the United States and title to all materials, supplies, tools, equipment, services, power fuel and machinery was vested in the United States, it compensating the contractors for their property. Some equipment of the contractors was leased to the government. The C. F. Lytle Company and the Green Construction Company had general charge of the project under the immediate direction of the Pub-

lic Roads Administration. All claims of the employees here involved are for services performed in 1943.

The proposed highway extended in a general northwesterly and southeasterly direction and with the exception of a few miles southeast of Fairbanks was through a complete wilderness. The location of the various trails, highways and places can be more readily understood by reference to the map known in the record as Exhibit 1. Prior to the construction of the new highway known in the record as the Alcan Highway, there was a highway which extended from Valdez almost directly north to Big Delta and thence northwesterly to Fairbanks. This highway was known as the Richardson Highway and was not a good road. The Alcan Highway extended from Whitehorse, Canada, in a general northwesterly direction along the Tanana River Valley through the wilderness to Big Delta, at which point it formed a junction with and utilized the Richardson Highway to Fairbanks. In order to expedite the work so as to comply with the Army's requirement for completion, additional points of entry besides that existing at Big Delta had to be established. The Richardson Highway was westerly from the Alcan Highway and the junction with the Alcan Highway at Big Delta formed the apex of an inverted V, the Richardson Highway being the westerly wing of the V, and the Alcan Highway being the easterly wing of the V. The Public Roads Administration and the Army authorities decided to use an old trail extending from Gulkana on the Richardson Highway northeasterly to Slana, and thence drive a pioneer trail to some point on the route of the proposed Alcan Highway in the vicinity of the point designated on the map as Tanacross and from that point work northwesterly and southeasterly on the Alcan Highway.

In order to build the permanent road through the wilderness it was first necessary to break through with a pioneer or supply trail to serve the permanent construction sites. In opening up this supply trail they merely pushed back the tundra with bulldozers, knocked down trees and brush, erected temporary bridges with native lumber across that portion of the wide stream beds where they found running water, and thus made a trail through the wilderness barely sufficient to move new equipment and supplies up to the permanent construction sites. The supply trail southeast of a point later known as Tok Junction, toward the border, was built during and after September, 1942. This supply trail and the permanent road followed the same general direction. In some places they criss-crossed, while in others they were in the same clearing area, and in still other places they were fifteen miles apart. In 1943 the contractor organizations were assigned different portions of the permanent construction and proceeded to build the permanent highway and bridges in accordance with the plans and specifications, and with the exception of the superstructure on a number of bridges, completed the highway sufficiently so that a juncture was effected below the border into Canada on October 13, 1943.

Gas, oil and lubricants constituted over 50 per cent of the tonnage of materials used on the project. A bulk plant dealer for the Standard Oil Company of California maintained a gasoline and storage depot at Valdez, and all gas, oil and lubricants used on the project were purchased by the Public Roads Administration from the local dealer. Most of the remaining materials, goods and supplies were bought by the Public Roads Administration in the United States and were shipped by it in convoyed ships from west coast ports to Valdez. Small amounts were shipped by boat to Anchorage and then by rail to Fairbanks. In nearly all instances the goods, materials and supplies were consigned to "Public Roads Administration, Valdez, Alaska," or to "Lytle and Green, Valdez, Alaska," though some shipments were addressed to other contractors "c/o Lytle and Green," or "c/o Public Roads Administration," but however addressed everything when received was turned over to and taken into possession by the Public Roads Administration. The shipments at sea were under control of the armed forces and were unloaded by the Army from the ships to docks at Valdez. The contractors

then hauled the materials to the warehouses of the Public Roads Administration in Valdez. From there distribution was made as needed under direction of the project managers of the Public Roads Administration. Additional warehouses were established, first at Gulkana and Big Delta and later, in 1943, at Tok Junction, Alaska. With few exceptions all goods were first received, checked, assembled and warehoused at Valdez, the exception being that a few shipments were sent to Fairbanks, and as needed they were hauled up the Richardson Highway to the warehouse at Gulkana, which until the establishment of Tok Junction was the central control point of the whole project. At Gulkana the goods were again warehoused and in accordance with the needs of the project were hauled up the Richardson Highway to the Big Delta warehouse and later up the supply or pioneer trail to the Tok Junction warehouse. Nothing was released from any warehouse except upon a signed written requisition from the Public Roads Administration or the project managers. Transportation of the supplies and materials was accomplished by trucks owned or leased by the Public Roads Administration and operated either by the Public Roads Administration or contractor employees. At the completion of the work the warehouses were still full of unused materials and supplies.

The trial court found that the plaintiffs were not engaged in the production of goods for interstate commerce during their employment. It found that plaintiffs Peterson, Vollum and Dedrick were engaged in interstate commerce but that plaintiff Crabb was not so engaged. Peterson and Vollum were also allowed extra compensation for the seventh day of work in a week because of the provisions of Executive Order No. 9240, 40 U.S.C.A. § 326 note, which the court held was made a part of their contract of employment. The court expressed the view that one working on the original construction of a new road is not engaged in interstate commerce although the road when finished is intended for use in such commerce, and the court found that the Alcan Highway did not become an international road until its completion in October, 1943, and that the road or trail built in 1942 could not be used as an international road as it was impassable for traffic in 1943 and could not be used for commerce. The court expressed the view that "were it not for the commerce flowing from the port of Valdez to the associated contractors these roads could not be considered instruments of commerce and building bridges thereon would have to be considered as intrastate employment," [65 F. Supp. 369, 376] and that the transportation of goods, supplies and materials from Valdez on the supply route to Tanacross or Tok Junction and then along or upon the Alcan Highway or trail in Alaska to the associated contractors was interstate transportation or commerce; and that "insofar then as this transportation was upon such roads they were instruments of commerce and any work or repair thereon that facilitated the movement of these interstate goods would be so closely related to the movement as to be a part thereof." As to employees Peterson and Vollum the court found that, "Their work consisted in looking after the warehouses and the property in transit in their warehouses and seeing that said property was properly invoiced, both ingoing and outgoing, and also assisted in loading some of the goods into transportation trucks," and "That the goods so handled and looked after were goods being transported in interstate commerce from Seattle, Washington, in the United States to the several associated contractors in Alaska." The court also found that the goods did not cease their interstate commerce character until they were received by the associated contractors.

It is the contention of the employers that the original construction of the highway did not constitute commerce; that the goods, building materials and supplies when they were unloaded at Valdez and placed in the warehouses and commingled with the general stock of goods came to rest prior to being handled by any of the plaintiffs and that the further movement of these shipments was not a part of interstate commerce; that these shipments came into the actual physical possession of the ultimate consumer when delivered at Valdez.

While the court held that the Alcan Highway was a project involving only new construction and that it was not during 1943 an interstate highway, it sustained the right of recovery here on the theory that the goods and supplies coming from Valdez were still in interstate commerce and the court expressed the view that, "It is the use of the road and not the road itself that determines its commercial character." Determination of the legal question under the undisputed facts, as to whether a shipment of goods came to rest at Valdez to such an extent as to interrupt the interstate character of the transportation seems to be of controlling importance. It was the view of the court that these goods were destined for delivery to the associated contractors. The associated contractors, however, were mere supervisors, employees and representatives of the Public Roads Administration. The supplies were in fact consigned to the Public Roads Administration and belonged to it. The so-called associated contractors did not buy, own or control any of these goods. The goods were commingled, received and stored in the warehouses; they were not earmarked for any person; they were retained in the warehouses for varying periods and at the end of the work the warehouses were still "jammed full" of supplies. These facts distinguish the present cases from the so-called warehouse cases. The Supreme Court, in Higgins v. Carr Brothers Co., 317 U.S. 572, 63 S.Ct. 337, 87 L.Ed. 468, held that as to an ordinary wholesaler the interstate journey terminated on receipt of the interstate goods by the wholesaler and did not extend to further deliveries to its customers, and in Walling v. Mutual Wholesale Food & Supply Co., 8 Cir., 141 F.2d 331, 339, we said that, "we confine our decision to the situation here which is that this warehouse was the wholesale link in an integrated business moving interstate goods from manufacturers or other wholesalers to the stores of a particular contract customer who retailed those goods."

The so-called associated contractors, as we have observed, had no pecuniary interest in nor control of these supplies. They belonged to the United States represented by the Public Roads Administration and had been delivered into its physical possession, and it, and it alone, controlled the disposition or movement of the goods after they were received at Valdez.

In Republic Pictures Corporation v. Kappler, 8 Cir., 151 F.2d 543, 162 A.L.R. 228, we sustained the interstate character of the movement of goods but in that case it was pointed out that the defendant was not shipping the property to be stored nor for final delivery, but its business depended upon the property being kept in circulation. The employee there was held to be an active factor in keeping the films in circulation. In that case there were customers, as in the other warehouse cases. The doctrine of the warehouse cases can not be invoked where the goods have reached the ultimate consignee, and the court here found that, "Immediately upon their arrival they were taken in charge by the Public Roads Administration or the project managers and were parceled out and distributed as those managers saw fit," and "The goods were unloaded by Army personnel and first assembled at Valdez and later taken to warehouses and distributing points at different locations, by employees of contractors working under the direction of the project managers and the Public Roads Administration." In these warehouses all the accounting and receiving reports were made out. The steamship companies delivered manifests showing what merchandise was consigned to the project and when it was checked into the warehouses the steamship companies received reports which were sent to the accounting office. Valdez was the control center of all merchandise that came to this project. It is significant that none of the shipments received were segregated for any particular contractor, but everything went into the common mass from which it was later requisitioned as needed, and it was requisitioned not from Seattle, Washington, but from Valdez. The Public Roads Administration being the consignee and the contractors its mere employees, we are of the view that the interstate character of these shipments ended when the goods were unloaded and stored at Valdez, and that movement elsewhere thereafter was only in the furtherance of

the work of the consignee and was local rather than interstate.

Section 203(i) of the Fair Labor Standards Act provides: " 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."

The goods here involved were shipped to Valdez and were there delivered into the actual physical possession of the Public Roads Administration or its project managers, who, as has been pointed out, were mere supervisors for the Public Roads Administration. It should be borne in mind that the court found that all of the goods in Alaska used on the project were owned by the United States of America. These goods so owned were delivered to the owner who took actual physical possession of them. The Public Roads Administration was the ultimate consumer. Under similar facts it is held by controlling authorities that when the ultimate consumer or user receives goods for his use, the interstate transportation or commerce feature is at an end. Higgins v. Carr Brothers Co., supra; Soderberg v. S. Birch & Sons Constr. Co., 9 Cir., 163 F.2d 37; Barbe v. Cummins Const. Co., D.C.Md., 49 F.Supp. 168; Baloc v. Foley Bros., Inc., D.C.Minn., 68 F.Supp. 533; Kansas City Structural Steel Co. v. Arkansas, etc., 269 U.S. 148, 46 S.Ct. 59, 70 L.Ed. 204; Brue et al. v. J. Rich Steers, Inc., et al., D.C. S.D. N.Y., 60 F.Supp. 668; Phillips v. Star Overall Dry Cleaning Laundry Co., 2 Cir., 149 F.2d 416.

There can therefore be no recovery by Dedrick; neither can there be any recovery by Peterson and Vollum, unless these employees were entitled to recover claims made by them under Executive Order 9240, promulgated October 1, 1942. That order provided that where, because of emergency conditions, "an employee is required to work for seven consecutive days in any regularly scheduled work week a premium wage of double time compensation shall be paid for work on the seventh day." This order applied to all work relating to the prosecution of the war. It provided: "All Federal departments and agencies shall conform the provisions in all existing and future contracts negotiated, executed, or supervised by them to the policies of this order. All such departments and agencies shall immediately open negotiations to alter provisions in existing contracts to conform them to the requirements of this order."

In their amended and supplemental complaint Peterson claimed $355.49 under this order and $1,124.52 under the provisions of the Fair Labor Standards Act, while Vollum claimed $723.60 under this order and $1,229.58 under the provisions of the Fair Labor Standards Act. The judgment of the court allowed Peterson recovery of $232.29 for overtime during the first six days work week, a similar sum as liquidated damages, and $112.25 for work performed on the seventh consecutive day of his week's work. Vollum was allowed recovery of $206.18 for overtime during the first six days of the week, a similar sum as liquidated damages, and $183.86 for work performed on the seventh day of his week's work. An attorney fee was also allowed. Their claims were joined as one cause of action in the complaint, but it is apparent that two separate causes of action are alleged.

It is conceded that the court had jurisdiction over the claims under the Fair Labor Standards Act but as to the claims under Executive Order 9240 it is contended by appellant that they rest upon contract, these plaintiffs being third party beneficiaries of the contract between the employers and the Public Roads Administration, and that there is lacking diversity of citizenship, all parties being citizens of Iowa, and that there is also lacking the jurisdictional amount. The Fair Labor Standards Act presupposes a contract of employment and in that sense an action to recover overtime is an action on contract. Republic Pictures Corp. v. Kappler, supra; Northwestern Yeast Co. v. Broutin, 6 Cir., 133 F.2d 628. In order to recover under the Fair Labor Standards Act the employee must have been engaged in interstate commerce. When so employed that act be-

comes a part of his contract, but if not so employed that act has no bearing upon his contract. Order 9240, however, is not so limited, but if it may be invoked by the employee, a question which we do not decide, may be invoked as a part of all government contracts of employment regardless of whether the employee is engaged in interstate commerce. Here we have held that these employees were not engaged in interstate commerce. The right to recover under the order is manifestly a separate and independent cause of action and the causes of action are wholly unrelated. In fact, one cause of action might fail without affecting the other. It is conceded that the Fair Labor Standards Act does not provide for double time on the seventh consecutive day in the work week.

■ Where two distinct grounds are alleged in support of a single cause of action, one of them involving a federal question and the other not, the Federal Court has jurisdiction to dispose of the case even though the federal ground may not be established. It is here contended that at least the alleged right to recover under the Fair Labor Standards Act raises a substantial federal question and that even though that ground may not be established, yet the court had jurisdiction to dispose of the case on non-federal grounds. In considering a somewhat similar contention the Supreme Court in Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 589, 77 L.Ed. 1148, said: "The distinction to be observed is between a case where two distinct grounds in support of a single cause of action are alleged, one only of which presents a federal question, and a case where two separate and distinct causes of action are alleged, one only of which is federal in character. In the former, where the federal question averred is not plainly wanting in substance, the federal court, even though the federal ground be not established, may nevertheless retain and dispose of the case upon the nonfederal ground; in the latter it may not do so upon the nonfederal cause of action."

■ Manifestly, where two separate and distinct causes of action are joined, there must be federal jurisdiction of both causes and where only one is federal in character and that one is not sustained, the court is without jurisdiction to pass upon the other cause of action. General Motors Corp. v. Rubsam Corp., 6 Cir., 65 F.2d 217; Hurn v. Oursler, supra. In a recent case, Sweet et al. v. B. F. Goodrich Co., D.C.Ohio, 68 F.Supp. 782, in referring to this question it it said: "The District Court is one of limited jurisdiction which the Congress can grant or take away. Jurisdiction is never a question to be left to doubt. If the Congress grants it it must appear by clear and unambiguous provisions. No grant of jurisdiction either directly or by delegation provides a forum here for the violation of Executive Order No. 9240."

Compare: Geneva Furniture Mfg. Co. v. S. Karpen & Bros., 238 U.S. 254, 35 S.Ct. 788, 59 L.Ed. 1295; Ingenuities Corp. et al. v. Metcalf Neckwear Co. et al., D.C.N.Y., 35 F.Supp. 575.; Snell, Inc., v. Potters, 2 Cir., 88 F.2d 611.

■ We conclude that the court was without jurisdiction to adjudicate these claims urged under Executive Order 9240.

■ In the action brought by employee Crabb the court found that he had failed to prove that he was engaged in interstate commerce or that his work was so closely related to such commerce as to be considered a part of it. Crabb was working as a timber foreman in the construction, repair and operation of three sawmills located at various places not upon the Alcan Highway or the supply route. His work was to secure logs and cut them into lumber which was hauled by an independent agency from the sawmill to the Alcan Highway. He had nothing to do with the moving of the traffic as did Peterson and Vollum. As his work was original construction and not repair to an instrumentality of interstate commerce in use, he was not, we think, entitled to recover. Pedersen v. Delaware, L. & W. R. Co., 229 U.S. 146, 33 S.Ct. 648, 57 L.Ed. 1125, Ann.Cas. 1914C, 153; Raymond v. Chicago, M. & St. P. R. Co., 243 U.S. 43, 37 S.Ct. 268, 61 L.Ed. 583; New York Cent. R. Co. v. White, 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667, L.R.A.1917D, 1, Ann.Cas.1917D, 629;

Oregon Short Line R. Co. v. Gubler, 8 Cir., 9 F.2d 494; Noonan et al. v. Fruco Const. Co., 8 Cir., 140 F.2d 633, 634.

In the last cited case, it was claimed by the appellant that his work was within the coverage of the Fair Labor Standards Act because of the special design and construction of the building and its intended future use. In the course of the opinion it is said: "The legislative history of the Act makes it clear that Congress did not intend to give the phrase 'engaged in commerce' a coverage which would reach out and encompass any employment activity which might 'affect commerce' in the sense that the phrase has been used in other acts. Employment activities which merely 'affect commerce' in some indirect way are not contemplated by the Act. * * * We are unable to find here that the watchmen employed to guard the construction of a new building are in an occupation 'necessary' to the production of goods for commerce, even though it is contemplated that the products manufactured in the building will be sent into interstate commerce."

We are clear that the court committed no error in denying recovery in the Crabb case.

The judgment in Crabb v. Welden Brothers is affirmed. The judgments in Dedrick v. Welden Brothers, Peterson v. C. F. Lytle Company, et al., and Vollum v. C. F. Lytle Company, et al., are reversed and said causes are remanded to the trial court with directions to enter judgments of dismissal.