**Bernard WEINBERGER, Plaintiff,**

v.

**NEW YORK STOCK EXCHANGE by Robert W. Haack, President, Defendant.**

**No. 69 Civ. 4461.**

United States District Court,
S. D. New York.

Dec. 14, 1971.

Poletti, Freiden, Prashker, Feldman & Gartner, New York City, for plaintiff by Paul R. Grand and Paul DeRensis, New York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for defendant by An-

drew J. Connick and Norman R. Nelson, New York City, of counsel.

GURFEIN, District Judge.

In his original complaint of October 9, 1969, the plaintiff, a former limited partner of Ira Haupt & Co. (hereinafter Haupt), now bankrupt, stated two claims for relief against the New York Stock Exchange (hereinafter Exchange). The first count charged a violation of Section 6 of the Securities Exchange Act of 1934 (15 U.S.C. § 78f) in that the Exchange failed adequately to supervise Haupt as a member firm of the Exchange to the damage of the plaintiff. He denominated the count as one "to enforce a liability or duty created by said Act." The second count charged the Exchange with a violation of Section 10(b) of the 1934 Act (15 U.S.C. § 78j(b)) and Rule 10b–5 in that the Exchange wilfully omitted to state material facts and stated untrue material facts in connection with the sale to plaintiff of a limited partnership—allegedly a "security" as defined in the Act. Diversity of citizenship was not alleged. Jurisdiction was asserted under Sections 6 and 27 (15 U.S.C. § 78aa) as well as Section 10(b) of the 1934 Act.

The defendant, on December 8, 1969, moved to dismiss the first count on the ground that it was barred by the three-year statute of limitations applicable to actions "to recover upon a liability, penalty or forfeiture created or imposed by statute" (N.Y.C.P.L.R. § 214(2) (McKinney 1963)). That motion was apparently withdrawn upon advice by the plaintiff's attorneys that an amended complaint would be served. This amended complaint was served in January of 1970.[1]

The amended complaint repeats the second count (the 10b–5 count), but the first count is different. Instead of charging a violation of the 1934 Act—a liability created by statute—the plaintiff alleges a *contract* between the Exchange and the Securities and Exchange Commission (hereinafter SEC) of which the plaintiff as an "investor" is a third party beneficiary. In New York "an action upon a contractual obligation or liability" is subject to a six-year statute (N.Y. C.P.L.R. § 213(2) (McKinney 1963)). The avowed purpose of the plaintiff is to found the action on a theory which will not be time-barred under the three-year limitation imposed by the above-quoted Section 214(2).

The defendant Exchange now moves to dismiss the new first count solely on the grounds that it is time-barred under the three-year statute.[2] It may be noted that the New York statute on "a liability created by statute" was, in 1934, when Congress enacted the Securities Exchange Act, a six year statute (C.P.A. § 48(2)). Both parties assume that, since there is no applicable federal statute, the appropriate statute of limitations of the forum state will apply (Cope v. Anderson, 331 U.S. 461, 463, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947)).

To understand the respective contentions it is necessary to mention some antecedent events briefly. Haupt, a limited partnership, was a brokerage house which extended large credit to a concern named Allied Crude Vegetable Oil Refining Co. which, it turned out, had supplied fake warehouse receipts as collateral for vegetable oil. Haupt had given credits of from 2.5 million dollars to 13 million dollars, and had carried on margin for Allied a long position in cottonseed oil futures. In November 1963, when Allied failed to meet margin calls against the long position, Haupt became liable for 18 million dollars in margin. On November 19, 1963 the general partners of Haupt notified the Exchange that Haupt's aggregate indebtedness exceeded its net capital by more than 2,000 per cent. Subsequently Haupt was suspended by the Exchange and it was dis-

1. For irrelevant reasons the present motion was earlier made and withdrawn without prejudice. It is now ripe for decision.

2. It is apparently assumed by both parties that if a three-year statute applies the action will be time-barred.

covered that the warehouse receipts were worthless. Thereafter Haupt was adjudicated a bankrupt.

The first count substantially alleges these described events and also alleges that the Exchange in 1934 had applied to the SEC to be registered as a national securities exchange. Pursuant to Section 6(a) (1) of the 1934 Act it filed an agreement by which it undertook to comply and to enforce, so far as was within its powers, compliance by its members with the provisions of the Act and its rules. This agreement, it is alleged, was for the purpose of insuring fair dealing in securities and protecting investors, and was executed as a condition to and in consideration of becoming registered as a national exchange. The SEC is alleged to have accepted this agreement in 1934. On July 1, 1963, the Exchange filed an annual amendment to its application for registration and filed therewith a renewed agreement. This allegedly reaffirmed the agreement of compliance and enforcement previously mentioned (Amended Compl. ¶¶ 3–5). Implementing the agreement, Article III of the Exchange's Constitution as of May 31, 1963 provided that the Board of Governors was vested with all powers necessary, *inter alia*, for the government of the Exchange and the regulation of the business conduct of its members; the Constitution also gave the Board the power to make rules and to provide penalties for their violation (Art. III § 1; Amended Compl. ¶ 6). Further provisions establish the rule-making power of the Board with respect to the formation of member firms and the business conduct of members (Art. III § 5). It is also provided in Article III § 6:

"The Board of Governors shall have general supervision over members, allied members, member firms and member corporations. It may examine into the business conduct and financial conditions of members, allied members, member firms and member corporations. It shall have supervision over partnership and corporate arrangements and over all offices of such members, firms and corporations, whether foreign or domestic, and over all persons employed by such members, firms and corporations, and may adopt such rules with respect to the employment, compensation and duties of such employees as it may deem appropriate . . . ."

The complaint goes on to allege that, notwithstanding its contractual obligation to comply and enforce compliance of its members with the 1934 Act and rules thereunder, the Exchange, in contravention of Section 6 of the Act, failed to promulgate or enforce rules requiring that general partners of member firms (1) delegate only to qualified principals or employees authority for supervision and control, and provide for appropriate procedures of supervision and control; (2) establish a system of follow-up and review; and (3) "require that the amounts and types of credit extended by a member organization shall be supervised by a general partner qualified by experience for such control in the types of business in which the member organization extends credit" (Amended Compl. ¶ 7). It is then alleged that, as a result of the Exchange's failure to promulgate and enforce such rules, the general partners of Haupt failed to delegate authority to qualified people or to supervise them appropriately or to supervise the amounts and types of credit extended by Haupt to customers (Amended Compl. ¶ 8). The "salad oil" debacle is attributed to the foregoing lack of supervision of Haupt by the Exchange (Amended Compl. ¶ 9).

It is further alleged that, under Rule 419 of the Rules of the Exchange, members are required to make available to customers on request a statement of financial condition prepared in conformity with generally accepted accounting principles (Amended Compl. ¶ 10). The Exchange allegedly received from Haupt, on August 12, 1963, a financial statement dated May 29, 1963 which overstated by more than $400,000, or almost 5% of net worth, the amount of capital contributed by limited partners and sub-

ject to the claims of creditors. The Exchange had received previously from Haupt an answer to the Exchange's financial questionnaire which allegedly revealed this falsity. The Exchange knew or should have known that Haupt was distributing the false statement "to customers and prospective purchasers of partnership interests in Haupt, such as plaintiff" (Amended Compl. ¶ 11). Yet, it is alleged, the Exchange knowingly failed to exercise its remedial and disciplinary powers in the face of this action, notwithstanding its contractual obligation to comply and to enforce compliance with the 1934 Act and its rules (Amended Compl. ¶ 12).

On or about October 10, 1963 Haupt allegedly sold a limited partnership to the plaintiff for $250,000. The agreement with the SEC by the Exchange "was made for the benefit and protection of investors, of which plaintiff is one" (Amended Compl. ¶ 14). Damages for breach of that agreement is alleged in the sum of $250,000.

The jurisdiction for the amended complaint is alleged to rest upon a federal question and an amount in controversy in excess of $10,000 pursuant to 28 U.S.C. § 1331(a). Again, diversity of citizenship is not alleged, nor is there an allegation that there is pendent jurisdiction for the first count because of the second count.

Section 6 of the Securities Exchange Act of 1934 reads as follows:

"(a) Any exchange may be registered with the Commission as a national securities exchange under the terms and conditions hereinafter provided in this section, by filing a registration statement in such form as the Commission may prescribe, containing the agreements, setting forth the information, and accompanied by the documents, below specified:

"(1) An agreement (which shall not be construed as a waiver of any constitutional right or any right to contest the validity of any rule or regulation) to comply, and to enforce so far as is within its powers compliance by its members, with the provisions of this Act, and any amendment thereto and any rule or regulation made or to be made thereunder; . . . ."

■ We have been instructed that, in this section, the Congress intended to create, by implication, a private cause of action against a national securities exchange like the defendant Exchange. Baird v. Franklin, 141 F.2d 238 (2 Cir.) cert. denied, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944). The liability of the Exchange was held to flow from a breach of its *statutory* duty to regulate its member firms (141 F.2d at 244–245).[3] That case arose out of the peculations of Richard Whitney, a partner in a member firm. The plaintiffs in *Baird* had also supported their claim for relief on the theory that the agreement between the Exchange and the SEC was for the benefit of plaintiffs as third party beneficiaries. The Second Circuit, having held that a violation of the *statutory* duty gave rise to a private cause of action,[4] found it unnecessary to pass upon the alternative ground of third party recovery based upon a *contract* for their benefit—"the narrower contract problem" (141 F.2d at 244). That problem is now here for decision, apparently as a matter of first impression.

As a preliminary to determining whether a contract for the benefit of a third party exists, we should determine to what law we look for guidance. Is it the state law of New York or is it federal law? In the present case, the claim is based on an alleged contract, but that contract is one that was imposed upon the contracting parties by an Act of

---

3. The citation is to the opinion of Judge Clark, dissenting on other grounds, because the legal theory is there made more explicit; but the majority "accede[d] to the view that the Stock Exchange violated a duty when it failed to take dis-ciplinary action against Richard Whitney" (141 F.2d at 239).

4. The plaintiffs failed to show resultant damages, however, and were, therefore, denied relief.

Congress, *viz.*, Section 6 of the 1934 Act. The issue could be restated as whether, following New York conflicts rules, the law of the state where the contract was to be performed [5] or where the contract's "center of gravity" lies [6] should govern (either of which theories would point to New York substantive law) *or* whether the effectuation of the Act of Congress by the statutorily-required contract suggests that federal common law should govern.[7]

In the case at bar, that issue loses its importance because New York law and federal common law would reach the same result as to the status of the plaintiff as third party beneficiary of the agreement. The general rule, as a restatement of existing law, is that formulated by the American Law Institute in its Restatement of Contracts § 145 (1932):

"A promisor bound to the United States or to a State or municipality by contract to do an act or render a service to some or all of the members of the public, is subject to no duty under the contract to such members to give compensation for the injurious consequences of performing or attempting to perform it, or of failing to do so, unless,

(a) an intention is manifested in the contract, as interpreted in the light of the circumstances surrounding its formation, that the promisor shall compensate members of the public for such injurious consequences, . . . " [8]

It is assumed that if federal common law were to be applied, under the exceptions implicit in Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), it would follow the guidelines of the Restatement. And see United States ex rel. Midland Loan Finance Co. v. National Surety Corp., 309 U.S. 165, 170–171, 60 S.Ct. 458, 84 L.Ed. 677 (1940).

The New York rule also appears to be in accord with the Restatement. Fata v. S. A. Healy Co., 289 N.Y. 401, 46 N.E.2d 339 (1943) held that a *contract* drafted pursuant to a statutory command may afford a remedy to an individual within the benefited class.[9] That case involved a suit by an employee to recover the difference between wages paid him and statutory minimum wages, which were incorporated in the contract between his employer and the Board of Water Supply.

To determine under Section 145 whether "an intention is manifested in the contract, as interpreted in the light of the circumstances surrounding its formation, that the promisor shall compensate members of the public for such injurious consequences," we look to two

---

5. See Restatement (First) of Conflict of Laws § 358 (1934), and New York Annotation thereto.

6. See Restatement (Second) of Conflict of Laws § 188 and Reporter's Note thereto; § 205, Comment d (1971).

7. In support of the idea that federal law should control, see Friendly, In Praise of Erie—and of the New Federal Common Law, 39 N.Y.U.L.Rev. 383, 409, 412–422 (1964); Crabb v. Welden Bros., 65 F. Supp. 369, 376–377 (S.D.Iowa 1946), rev'd on other grounds, 164 F.2d 797 (8 Cir. 1947); cf. Priebe & Sons v. United States, 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947).

8. Tentative Draft No. 3 (1967) of Restatement (Second) uses different phraseology but the comment to Section 145 states: "If there is no explicit promise [to pay damages] and no government liability, the question whether a particular claimant is an intended beneficiary is one of interpretation, depending on all the circumstances of the contract." Thus, no change in substance is intended for § 145.

9. Indeed, the New York Court of Appeals has gone further to hold that where a contract is made pursuant to a *federal* statute, New York will follow the *federal* contract rule—the reverse of *Erie.* See Filardo v. Foley Bros., 297 N.Y. 217, 225, 78 N.E.2d 480, 484 (1948), rev'd on other grounds, 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680 (1949). Note that this holding might moot the choice of law between federal common law and state law, since the initial reference to state law in any case is to the forum's conflicts rules which here appear to refer us to federal common law. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

sources. (1) As Chief Judge Lehman did in *Fata, supra,* we look to the statute to determine whether it "was intended for the direct benefit of laborers as well as for the indirect benefit of the State," If that statutory intention is found, "[i]t cannot be doubted that provisions requiring the contractor to pay such wages are also inserted in the contract, whether voluntarily or under compulsion of the statute, for the benefit of the laborers as well as for the benefit of the public body which is a party to the contract" (289 N.Y. at 405, 46 N.E.2d at 341). (2) We look to see whether the particular statute has already been interpreted by the courts to give judicial meaning to the legislative intent. With regard to this federal statute, we have such interpretation by our own Court of Appeals in Baird v. Franklin, *supra.*

The Court there hurdled the difficult question of whether the Exchange was liable to private persons for failing properly to supervise its member firms, and held that it was the intention of the Congress to provide a remedy for such dereliction of duty. That holding was read into the 1934 Act. It is as if the Act itself used the express language of intention and remedy. We are bound by that judicial finding of Congressional policy.

If we apply the Congressional intent found in Baird v. Franklin to the agreement by the Exchange, that agreement must be read as being for the benefit of investors.[10] We come to the conclusion,

therefore, that the policy of federal law, as interpreted in the Second Circuit, makes an investor more than an incidental beneficiary of the contract mandated by an Act of Congress. It gives him an independent claim for relief.[11]

The defendant contends, however, that there is no need to determine whether the plaintiff is a true beneficiary of a contract because Congress did not intend the agreement filed by the Exchange to be a contract in the ordinary meaning of that term. The "agreement" between the Exchange and the SEC, it is urged, was nothing more than a condition precedent to a license to engage in a particular business. That argument elides the point.

A governmental license may be conditioned upon the performance of many things, but one of the conditions of registration may be that a separate contract supported by mutual consideration [12] be executed. Section 6 of the Exchange Act does not speak in terms of a condition such as the mere unilateral promulgation of Stock Exchange Rules as a prerequisite to registration. It speaks in terms of a covenant by the Exchange to perform its duty, and provides for the covenant to be contained in a separately filed agreement. While the legislative history of the 1934 Act is not conclusive, it does disclose that an earlier draft of the proposed Act provided for the registration of a stock exchange without an explicit provision for an "agreement" by

---

10. Since the Exchange is already liable for any breach of its statutory duty, the imposition of a virtually coterminous contractual duty will not have the disruptive effect of an unexpected civil liability, which is sometimes seen as an argument against third-party recovery, *e. g.,* Moch Co. v. Renssalaer Water Co., 247 N.Y. 160, 159 N.E. 896 (1928).

A further argument supporting the imposition of liability is that there would be no reason to require an agreement of the exchanges if members of the public could not claim thereunder, since under no circumstances could the Government suffer damages recoverable under that agreement.

11. For analogous holdings, see United States ex rel. Johnson v. Morley Const. Co., 98 F.2d 781, 788–789 (2 Cir. 1938) (laborers suing as third party beneficiaries of government contract) ; Lemon v. Bossier Parish School Board, 240 F.Supp. 709, 713 (W.D.La.1965), aff'd, 370 F. 2d 847 (5 Cir. 1967) (Negro children suing as third party beneficiaries of defendant's loan from federal government).

12. The consideration given by the United States includes the franchise to the Exchange to conduct its business and the delegation of regulatory power to the Exchange. Cf. Fryns v. Fair Lawn Fur Dressing Co., 114 N.J.Eq. 462, 168 A. 862 (1933).

the exchange to enforce the Act.[13] The "agreement" language was later added.[14] The suggestion was made by the Exchange that no reference to an agreement be included in the Act.[15] This suggestion was rejected while other amendments suggested by the Exchange were accepted.[16] It may be seen, then, that the requirement for filing an agreement was not the inadvertent language of the draftsmen.[17] An agreement was to be a necessary part of registration.

As an agreement, it achieves a status of its own as a contract and should be governed by the statute of limitations applicable to contracts.[18] In actions on qualifying bonds *given pursuant to a statute,* the six-year period of limitations is applicable rather than the shorter statute for actions to recover a statutory penalty. See People v. Corcillo, 195 Misc. 198, 88 N.Y.S.2d 534 (Sup.Ct. Albany Co. 1949), aff'd, 276 App.Div. 675, 97 N.Y.S.2d 319, leave to appeal denied, 277 App.Div. 911, 98 N.Y.S.2d 592 (3d Dept.1950).[19]

■ The policy of applying federal law for the benefit of investors also supports a choice of that state statute of limitations which is the more liberal. Where rights are derived from state law,

state law must be followed to avoid a discrimination based on the choice of the federal forum. See Holmberg v. Armbrecht, 327 U.S. 392, 395, 66 S.Ct. 582, 90 L.Ed. 743 (1946). But where a federal statute is involved, "the question of which local limitations period is appropriate calls for a consideration of the objectives of the substantive federal statute and how they can best be achieved. *See* International Union, United Auto Workers v. Hoosier Cardinal Corp., 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966)." Douglass v. Glenn E. Hinton Investments, Inc., 440 F.2d 912, 915 (9 Cir. 1971).[20]

We are required, lastly, to determine, although this is not the ground of the present motion to dismiss, whether in the absence of diversity of citizenship federal jurisdiction exists in any event.

■ While there is no allegation concerning pendent jurisdiction, the Court will assume that the first count, even if it states only a claim for relief under state law, would be sustained under the theory of pendent jurisdiction (Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). The

13. Hearings on H.R. 7852 and 8720 Before the House Comm. on Interstate and Foreign Commerce, 73d Cong., 2d Sess. 4 (1934); see also 78 Cong.Rec. 8579 (1934).

14. See H.R. 9323 (1934); S. 3420 (1934).

15. Hearings on S.Res. 84, 56 & 97 before the Senate, Comm. on Banking and Currency, 73d Cong., 2d Sess., pt. 16, 7545 (1934).

16. 78 Cong.Rec. 8489 (1934).

17. During debate in the House a substitute bill was offered which eliminated reference to an agreement by the Exchange. It was rejected. 78 Cong.Rec. 8113–15 (1934).

18. Per contra, where a fraud charge is based on the terms of the very contract in suit, Brick v. Cohn-Hall-Marx Co., 276 N.Y. 259, 11 N.E.2d 902 (1937), or where in a simple negligence case fraud is alleged merely in keeping the defend-

ant unaware of the hazardous condition (Miller v. U. S. Gypsum Co., 96 F.2d 69 (2 Cir. 1938)), courts will not permit the superimposition of such causes of action, which cannot stand alone on their merits, to avoid the statute of limitations.

19. Although *Corcillo* dealt with limitations on a "statutory penalty," while we are dealing with a "liability created by statute," the reasoning is applicable—the contract, made pursuant to a statute, is governed by the *contract* statute of limitations rather than by some other statute of limitations which is shorter.

20. Judge Motley in Maher v. J. R. Williston & Beane, Inc., 280 F.Supp. 133 (S.D. N.Y.1967) held that even where the statute of limitations barred a claim under Section 15(c) of the 1934 Act, an amended complaint charging violation of Section 10(b) of the Act based on the same facts, and avowedly brought to overcome the bar of the federal statute of limitations, was not subject to dismissal.

second count, not under attack, appears to support federal jurisdiction provided that the subject matter of the alleged fraud—a limited partnership interest—is a "security."[21] Since there has been no motion to dismiss the second count, I shall assume it to be good and sufficient to support pendent jurisdiction for the first count.

If the second count should fail for lack of subject matter jurisdiction on a pretrial motion, however, an interesting question of federal jurisdiction would be presented. Does breach of a contract whose source is federal law *ipso facto* become cognizable in the federal courts as one which "arises under the . . . laws . . . of the United States" (28 U.S.C. § 1331(a))?[22] The answer is somewhat obscure and will not have to be decided if the pendent jurisdiction based on the validity of the second count should be sustained.

 Since a claim for relief under the agreement of the Exchange with the SEC is made out, the applicable statute of limitations is held to be the New York six-year statute. The motion to dismiss the first count of the complaint, therefore, is denied.

So ordered.

---

21. The term "equity security" is defined by the SEC in 17 C.F.R. § 240.3a11–1 to include any "limited partnership interest," as used in Section 12(g) (15 U.S.C. § 78l(g)) and Section 16 (15 U.S.C. § 78p). The rule-making power derives from Section 3(a) (11) of the Act (15 U.S.C. § 78c(a) (11)). But neither Sections 12(g) or 16 are involved in the second count, which is brought under Section 10(b). It is not altogether clear, therefore, whether a purchase of a limited partnership interest, within the context of Section 10(b), is always a "security." In Klebanow v. New York Produce Exchange, 344 F.2d 294 (2 Cir. 1965), the Court held, on the issue of capacity to sue, that limited partners in the Haupt firm could sue the New York Produce Exchange and others for violation of the antitrust laws. The suit there, however, was a derivative suit on behalf of Haupt, the partnership. It did not involve a direct suit brought by a limited partner on his own behalf claiming that he was defrauded in the purchase of a limited partnership interest. Judge Metzner in Pawgan v. Silverstein, 265 F.Supp. 898, 900 (S.D.N.Y. 1967) (a Section 10(b) case) held that a certain type of real estate syndication interest could "be classified either as a certificate of interest or participation in a profit sharing agreement or investment contract, and therefore a security. § 2(1) of the 1933 act. SEC v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L. Ed. 1244 (1946)." The Supreme Court has, generally, given a broad meaning to the term "security" under the 1933 Act, SEC v. W. J. Howey Co., *supra*, and under the 1934 Act, Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

22. In support of an affirmative answer, see Romero v. International Terminal Operating Co., 358 U.S. 354, 393, 79 S. Ct. 468, 3 L.Ed.2d 368 (1959) (Brennan, J., dissenting) ; Kurland, The Romero Case and Some Problems of Federal Jurisdiction, 73 Harv.L.Rev. 817, 831–33 (1960) ; Mishkin, The Federal "Question" in the District Courts, 53 Colum.L.Rev. 157, 165 (1953) ; Note, The Federal Common Law, 82 Harv.L. Rev. 1512, 1513–14 (1969).